HUSSEY COPPER, LTD.,
et al., Plaintiffs,

v.

UNITED STATES, Defendant,

Wieland–Werke AG, et al., Defendant–
Intervenors.

WIELAND–WERKE AG, et al., Plaintiffs,

v.

UNITED STATES, Defendant,

Hussey Copper, Ltd., et al.,
Defendant–Intervenors.

No. 91–12–00919.

United States Court of
International Trade.

Sept. 10, 1993.

Collier, Shannon, Rill & Scott, David A. Hartquist, Jeffrey S. Beckington, David C. Smith, Jr. and Stephen A. Jones, Georgetown Economic Services, Michael A. Hudak and

Theresa P. Burke, Washington, DC, Consultants, for Hussey Copper, Ltd., et al.

Arnold & Porter, Richard A. Johnson and Susan G. Lee, Washington, DC, for Wieland–Werke AG, et al.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Mark E. Montalbine, U.S. Dept. of Commerce, Barbara C. Potter, Washington, DC, of counsel, for defendant.

## MEMORANDUM OPINION AND ORDER

DiCARLO, Chief Judge:

Plaintiffs in this consolidated action, Hussey Copper. Ltd., The Miller Company, Outokumpu American Brass, Revere Copper Products, Inc., International Association of Machinists and Aerospace Workers, International Union, Allied Industrial Workers of America (AFL–CIO), Mechanics Educational Society of America (Local 56) and United Steel Workers of America (AFL–CIO/CLC) (collectively "Hussey"), Wieland–Werke AG, Langenberg Kupfer und Messingwerke GmbH, Metallwerke Schwarzwald GmbH, Wieland–America, Inc. and Wieland Metals (collectively "Wieland" or "the Wieland Group"), move for judgment on the agency record pursuant to Rule 56.1 of the Rules of this Court, challenging the final results of the antidumping duty administrative review by the International Trade Administration (ITA) of the Department of Commerce (Commerce) in *Brass Sheet and Strip From the Federal Republic of Germany*, 56 Fed.Reg. 60,087 (Dep't . Comm.1991) (Final Results), as amended, 57 Fed.Reg. 276 (Dep't Comm. 1992) (Amendment to Final Results). The court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

Hussey challenges Commerce's determination with respect to (1) the grouping of alloys in comparing "such and similar" merchandise, (2) the use of the London Metal Exchange prices in making the difference-in-merchandise adjustment, (3) consignment credit expenses in the home market, (4) inventory costs associated with Wieland's reserve stocks in the United States, (5) deduction of home market commissions, and (6) computer errors in computing inland freight insurance charges. Wieland challenges Commerce's determination with respect to (1) the denial of special adjustment for metal price fluctuations, (2) the use of best information available with respect to the "split-priced" sales, (3) adjustments for metal discount and early payment discount, (4) the use of best information available in imputing credit expenses for the U.S. and home market sales, (5) adjustments for certain physical differences in merchandise, (6) adjustment for differences in quantity sold, and (7) the resort to best information available with respect to merchandise further processed in the United States.

## BACKGROUND

Commerce issued the antidumping duty order on brass sheet and strip from the Federal Republic of Germany on March 6, 1987, establishing the dumping margins for Wieland at 5.31%. 52 Fed.Reg. 6,997 (Dep't Comm.1987). Pursuant to 19 U.S.C. § 1675 (1988), Commerce conducted the first administrative review covering the period from August 22, 1986 through February 29, 1988. The preliminary results of the first administrative review were published on July 10, 1990, establishing the margins for Wieland at 7.94%. *Brass Sheet and Strip From West Germany*, 55 Fed.Reg. 28,264 (Dep't Comm. 1990). The final results were published on November 27, 1991, changing the margins from 7.94% to 19.59%. *Final Results*, 56 Fed.Reg. 60,087. The margins were subsequently amended to 23.49%, based on corrections of certain clerical errors. *Amendment to Final Results*, 57 Fed.Reg. 276.

## DISCUSSION

■ This court must uphold Commerce's final determination in an administrative review unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Uni-*

versal Camera Corp. v. NLRB, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). It "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Comm'n, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted).

## A. Hussey's Challenges

### 1. "Such or Similar" Merchandise

To determine whether imported merchandise is sold at less than fair value (LTFV) and to calculate the dumping margin, Commerce must compare the United States price of the imported merchandise with its foreign market value (FMV), which is defined as the price at which "such or similar merchandise" is sold in the home market or a third country. 19 U.S.C. § 1677b(a)(1) (1988). The definition of "such or similar merchandise" is set forth in 19 U.S.C. § 1677(16) (1988), which provides:

The term "such or similar merchandise" means merchandise in the first of the following categories ...:

(A) The merchandise which is the subject of an investigation and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise.

(B) Merchandise—

(i) produced in the same country and by the same person as the merchandise which is the subject of the investigation,

(ii) like that merchandise in component material or materials and in the purposes for which used, and

(iii) approximately equal in commercial value to that merchandise.

(C) Merchandise—

(i) produced in the same country and by the same person and of the same general class or kind as the merchandise which is the subject of the investigation,

(ii) like that merchandise in the purposes for which used, and

(iii) which the administering authority determines may reasonably be compared with that merchandise.

In accordance with this statutory mandate, absent identical merchandise, Commerce must "choose the most similar merchandise" for comparison. Timken Co. v. United States, 10 CIT 86, 96, 630 F.Supp. 1327, 1337 (1986); see also Smith–Corona Group, Consumer Prod. Div., SCM Corp. v. United States, 1 Fed.Cir. (T) 130, 140, 713 F.2d 1568, 1578 (1983), cert. denied, 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984) (stating one of the goals of the statute is to guarantee Commerce makes the fair value comparison on a fair basis—comparing apples with apples). When similar merchandise is used for comparison, in order to ensure the "apples-to-apples" comparison and arrive at the most accurate dumping margins possible, Commerce makes adjustments to offset the price differential due to differences in the physical characteristics of the merchandise. See 19 C.F.R. § 353.57 (1993).

In this case, no identical merchandise is sold in the home market or a third country. Commerce established separate categories of most similar merchandise based on five primary characteristics of the merchandise: (1) form of material (sheet or strip), (2) coating (tinned or non-tinned), (3) grade (alloy composition), (4) gauge, and (5) width. Final Results, 56 Fed.Reg. at 60,088 (Comment 1). At issue is the third category, alloy composition.

■ The merchandise brass is an alloy that comprises two metals, copper and zinc, with copper being the larger and more expensive input. To match the merchandise on the basis of alloy composition, Commerce divided the merchandise sold in each market into two groups according to whether it contains more or less than 75% copper. After grouping, Commerce made adjustments for differences in alloys within each group. Specifically, based on the London Metal Exchange (LME) settlement prices, Commerce assigned a price per pound of copper and zinc for each grade within each group, and

derived a weighted-average group price as the basis for comparison.

Hussey contends that the grouping method is inconsistent with the statutory mandate to match the most similar merchandise for comparison because it resulted in comparing less similar products. For example, a product in the U.S. market with copper content of 71% would be compared with a home market product of 60% copper rather than 75% copper, despite the fact that the latter is more similar in copper content to the product sold in the U.S. market. According to Hussey, Commerce should have made exact alloy matching in this case as it did in all other investigations involving similar brass products, and there was no particular reason why Commerce could not make exact alloy matches in this case.

Commerce counters that exact alloy matching is not required by the statute, because the most similar merchandise in this case is not determined by alloy composition alone, but by five primary characteristics. According to Commerce, the 75% line merely served as a convenient cutoff for the grouping, the differences among alloys were properly accounted for by the adjustment. Therefore, Commerce argues that its decision to use the grouping method was a reasonable exercise of discretion.

■ As long as it follows 19 U.S.C. § 1677(16), Commerce has the authority to determine what constitutes most similar merchandise and what methodology to use in making such a determination. *See Timken,* 10 CIT at 98, 630 F.Supp. at 1338. "The Court grants substantial deference to Commerce in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law." *Serampore Indus. Pvt. Ltd. v. U.S. Dept. of Commerce,* 11 CIT 866, 873, 675 F.Supp. 1354, 1360 (1987) (citing *Consumer Prod. Div., SCM Corp. v. Silver Reed America, Inc.,* 3 Fed.Cir. (T) 83, 90, 753 F.2d 1033, 1039–40 (1985)).

The record indicates that each of Wieland's sales was a made-to-order product and the product characteristics varied along "a virtually infinite continuum" of gauges, widths and some other special characteristics. Pub.

R.Roll 1, Frame 335 (*Questionnaire Response,* App. A–4(b), June 20, 1988). Since the most similar merchandise in this case cannot be determined by alloy composition alone, making exact alloy matches does not necessarily lead to the comparison of most similar merchandise. That being the case, the court will not hold Commerce's use of a different method to match alloys as inconsistent with the statutory mandate.

Nothing in the record seems to suggest that the particular method used in this case is unreasonable. The record supports Commerce's claim that after the alloy grouping it made adjustments to account for the differences among alloys within each group. *See* Conf.R.Roll 5, Frame 260 (Mem. from Analyst to File, Method of Calculating Alloys Composition Adjustment, Dec. 16, 1991); *id.* Frames 267–74 (Analysts Notes & Worksheets, Jan. 16, 1992). As long as the adjustment has properly accounted for the cost differences attributable to the differences in alloy composition, Commerce is able to make the "apples-to-apples" comparison on the basis of alloy between the products sold in the U.S. market and the home market.

■ Hussey further claims that Commerce's grouping of alloys is inconsistent with its long-standing practice of using exact alloy matches in brass cases and that Commerce has failed to provide an explanation for its departure in this proceeding. Commerce, on the other hand, contends that it is irrelevant what Commerce did in other brass cases because other brass cases are separate proceedings, with separate records and information not before Commerce in this review.

■ It is "a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure.... This rule is not designed to restrict an agency's consideration of the facts from one case to the next, but rather it is to insure consistency in an agency's administration of a statute." *Citrosuco Paulista, S.A. v. United States,* 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988) (citations omitted). Although Commerce is traditionally granted broad discretion in its selection of methodology to implement the statute, Commerce may

not abuse its discretion and its choice of methodology may not be arbitrary. *See NTN Bearing Corp. of America v. United States,* 14 CIT 623, 634, 747 F.Supp. 726, 736 (1990) (affirming Commerce's choice of methodology for such and similar merchandise determination based on the finding that the methodology was not "mutely and arbitrarily" adopted and that Commerce "provided clear, reasonable explanations" for its choice).

The record shows that Commerce has not explained why it decided in this case not to follow its traditional methodology of exact alloy matching. There may be particular facts or arguments presented in this case that support Commerce's departure from its normal practice. However, "[w]hatever the ground for the departure from prior norms, ... it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate." *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade,* 412 U.S. 800, 808, 93 S.Ct. 2367, 2375, 37 L.Ed.2d 350 (1973). As Commerce has failed to adequately articulate the reasons for its departure from its normal practice, the court remands this issue to Commerce to explain why it did not follow its traditional methodology in this case.

## 2. Use of London Metal Exchange Prices

■ Hussey also claims that Commerce improperly supplied the London Metal Exchange data to make the adjustment for differences in alloy composition. According to Hussey, because Wieland failed to provide the alloy cost information as Commerce requested, Commerce should have resorted to best information available (BIA) for those U.S. sales with no home market matches based on exact alloy composition. Hussey contends that since the LME data were not adverse, Commerce's use of the LME data rewarded Wieland for its non-compliance.

The record shows that in its original questionnaire, Commerce asked Wieland to "[i]ndicate the cost difference attributable to each physical difference" between the product sold in the U.S. and the most similar product sold in the home market selected for comparison. Pub.R.Roll 1, Frame 55 (*Questionnaire,* at B-4, April 21, 1988). Wieland did not provide the information on cost differences attributable to alloy, gauge and width. With respect to alloy, Wieland responded by reporting that it followed the traditional distinction and grouped the alloys according to whether they have above or below 75% copper content. Pub.R.Roll 1, Frame 332 (*Questionnaire Response,* App. A-4(a)). Commerce adopted Wieland's grouping method for alloy and used the LME prices in calculating the adjustment for cost differences attributable to alloy. *See* Pub.R.Roll 1, Frame 1821 (Mem. from Analyst to File, Nov. 15, 1991).

■ The question is whether Commerce has discretion to supply the missing alloy cost information with the LME data instead of resorting to adverse data as BIA. When a party fails to provide requested information in the form required, the statute mandates that Commerce use the best information otherwise available. *See* 19 U.S.C. § 1677e(c) (1988). Commerce, however, has broad discretion in determining what constitutes the best information available in a given situation. The information Commerce may use as best information "includes all information that is accessible or may be obtained, whatever its source." *N.A.R., S.p.A. v. United States,* 14 CIT 409, 416, 741 F.Supp. 936, 942 (1990) (citations omitted). Here, Commerce's decision to use the LME data reflects its determination that the LME prices were the best information to use in this particular situation. Given that Commerce adopted, rather than rejected, Wieland's grouping of alloys as the basis for comparing the most similar merchandise, and that the need for making the adjustment for differences in alloy composition was created by the use of the grouping method (the adjustment would not be necessary if exact alloy matching had been used), the court finds that Commerce was reasonable in not resorting to adverse data as BIA.

## 3. Credit Expenses on Consignment Inventory

■ Certain of Wieland's home market sales were consignment sales, for which Wie-

land kept inventory at the customer location. In computing the FMV, Commerce deducted Wieland's imputed financing expenses associated with maintaining the consignment inventory. Hussey challenges the deduction on two grounds: (a) the long-term interest rate applied by Commerce to calculate the consignment credit cost is unsupported by evidence in the record; and (b) the deduction double counts Wieland's imputed credit expenses.

### (a) Long-term interest rate

Wieland reported its credit cost on consignment inventory by establishing the average inventory level for each customer during the review period, then multiplying the average inventory level by an average price to arrive at the amounts financed on behalf of each customer. Pub.R.Roll 1, Frame 481 (*Questionnaire Response*, App. B–5(g)). In calculating the credit expenses, Wieland used the company's long-term borrowing rate, which is higher than the short-term borrowing rate. *See Final Results*, 56 Fed.Reg. at 60,090 (Comment 9). Commerce explained that it accepted Wieland's claim for the reasons outlined in a confidential memorandum to the file dated November 8, 1991.[1] *Id.*

The court has found no information in the record indicating the average length of time for warehousing the consignment inventory. Wieland has not provided [[ ]] on the consignment sales. [[ ]] As the court has not found [[ ]] in the record, [[ ]] are unknown to the court. Absent evidence in the record, the court is unable to determine whether Commerce properly applied the long-term borrowing rate to the credit expense on consignment inventory.

### (b) *"Double counting"*

Hussey also contends that Commerce double counted the credit expense on consignment sales because it already deducted imputed normal credit expense for Wieland's home market sales. Commerce applied the short-term interest rate in calculating the imputed normal credit expenses.

As a threshold matter, Wieland alleges that Hussey failed to raise the issue of double counting during the administrative proceedings and is therefore barred from raising it in the judicial review under the principle of exhaustion of administrative remedies. The record shows, however, that Hussey challenged the appropriateness of the consignment credit claim by contesting various aspects of the deduction calculation during the administrative proceedings. *See, e.g.*, Pub. R.Roll 1, Frame 919–20 (Letter from Counsel for Hussey dated Sept. 8, 1988, at 16–17). Therefore, the court finds it is appropriate to address the issue.

Commerce indicated that the consignment credit expenses are [[ ]]. Conf.R.Roll 4, Frame 2379 (Mem. from Analyst to File, Nov. 8, 1991). The imputed credit expense, on the other hand, represents the financing expense for the period from the time of billing to the time of payment. *See* Pub. R.Roll 1, Frame 478 (*Questionnaire Response*, App. B–5(a)). Presumably, the period [[ ]], for which the consignment credit is extended, covers the period from billing to payment. If this is correct, Commerce has double counted the credit expense on these consignment sales.

In sum, the court finds that (a) Commerce's use of the long-term interest rate in calculating the consignment credit expense is unsupported by the record evidence, and (b) Commerce may have double counted the credit expenses for consignment sales to the extent that the period covered by the consignment credit is inclusive of the period covered by the imputed short-term credit. Accordingly, the court remands the issue to Commerce to (a) point out any record evidence that supports its use of long-term interest rate in calculating the consignment credit expense and if failing to do so, supplement the record with evidence justifying the use of long-term interest rate or, in the alternative, redetermine the interest rate for the consignment credit expense; and (b) redetermine, if necessary, the credit expense

---

1. The memorandum states: "[[ ]]" Conf.R.Roll 4, Frame 2379 (Mem. from Analyst to File, Nov. 8, 1991).

on consignment inventory so as to avoid any double counting.

### 4. Inventory Expenses in the U.S. Market

■ Wieland maintains pre-sale inventory ("buffer stocks") in the United States for certain customers, and the inventory expenses incurred include the warehousing charges plus financing expenses. Pub.R.Roll 1, Frame 511 (*Questionnaire Response*, App. C–4(g)). Hussey asserts that Commerce improperly treated Wieland's inventory expenses in the U.S. market as indirect selling expenses not deductible from the U.S. price.

In comparing the U.S. price and the FMV, Commerce is authorized to make allowances for differences in circumstances of sale which "bear a direct relationship to the sales compared." 19 C.F.R. § 353.56(a)(1) (1993). According to Commerce, direct selling expenses are those but for which a sale could not have occurred; indirect selling expenses are those that are not incurred because of a particular sale, but in order to advance sales in general. *See* 19 C.F.R. § 353.56(a)(2) (1993). Pre-sale inventory costs are generally considered indirect selling expenses because they are not directly related to particular sales. *See LMI–La Metalli Industriale, S.p.A. v. United States*, 8 Fed.Cir. (T) 157, 159, 912 F.2d 455, 457 (1990) (affirming Commerce's determination that LMI's inventory costs were not allowable for adjustment because they were incurred before sale and thus were deemed not directly related to domestic sales).

Hussey argues, however, that insofar as the U.S. inventory is maintained with certain particular customers in mind, it is not different from the consignment inventory in the home market. As Commerce has allowed the deduction of the home market consignment inventory costs from the FMV, it should also deduct the U.S. inventory costs from the U.S. price.

Commerce explains that it recognizes the home market consignment inventory costs as post-sale, direct expenses because these expenses are directly related to individual sales to a specific customer. In contrast, Commerce states,

pre-sale credit expenses for buffer stock arrangements on the U.S. sales are not related to specific sales or specific customers. In buffer stock arrangements, a potential customer is not obligated to purchase the products and the Wieland Group can withdraw merchandise from buffer stocks and ship it to any customer. Credit expenses associated with buffer stock arrangements are, therefore, indirect pre-sale warehousing expenses.

*Final Results*, 56 Fed.Reg. at 60,090 (Comment 10).

The record supports Commerce's explanation. The record indicates that although the buffer stocks "are maintained with certain customers in mind, Wieland is not [[ ]] material placed into those warehouses to those customers and it [[ ]] over the material" and that "[i]n some cases, Wieland withdraws the material for shipment to customers other than the ones who generally purchase material out of those warehouses." Conf.R.Roll 4, Frame 1880 (*Supp. Questionnaire Response*, Q. 69, Mar. 13, 1989). Hence, the court finds that Commerce's characterization of the U.S. inventory costs as indirect selling expenses is supported by substantial evidence in the record and is in accordance with law.

### 5. Deduction of Home Market Commissions

Hussey charges that Commerce improperly deducted home market commissions from the FMV. Commerce asserts that it correctly deducted home market commissions from the FMV in comparisons with exporter's sales price. *See* 19 C.F.R. § 353.56(b)(2) (1993). Commerce admits, however, that for purchase price sales, it incorrectly calculated the deduction of home market commissions by failing to subtract from the deduction indirect selling expenses incurred in the United States. *See* 19 C.F.R. § 353.56(b)(1) (1993). Thus, the court remands the issue for Commerce to correct the miscalculation.

### 6. Inland Freight Insurance Charges

Hussey claims, and Commerce admits, that Commerce improperly deleted from the margin analysis in its computer program the field containing the inland freight insurance

charges for U.S. sales. The court instructs Commerce to correct the error on remand.

### B. Wieland's Challenges

#### 1. Metal Market Price Fluctuations

■ In comparing the U.S. price with the FMV, Commerce used its standard methodology of comparing the price of an individual U.S. sale with a weighted average price of home market sales made in the same month. When there was no home market sale during the month in which a specific U.S. sale occurred, Commerce used home market sales within 90 days before or 60 days after the U.S. sale for comparison, (the 90/60 day rule). In the proceeding below, Wieland requested Commerce to make special adjustments for the metal price fluctuations that occurred during the period of review. Commerce denied Wieland's request on the grounds that significant fluctuations did not occur until the latter part of 1987 and that the monthly weighted averaging already reduces the potential for distortion. *See Final Results,* 56 Fed.Reg. at 60,089 (Comment 4).

Wieland asserts that Commerce is required by law to depart from its standard methodology in this case because there were such dramatic metal price fluctuations during the period of review that the use of the standard methodology created artificial dumping margins. According to Wieland, the metal price changes were beyond its control because its pricing system is based on the metal prices published daily in the German news service, VWD, which is linked to London Metal Exchanges prices, and the metal prices are passed through to customers on a daily basis. Wieland contends that a fair administration of antidumping law requires Commerce to take into account the economic reality and to make special adjustments for the price fluctuations that are beyond the foreign producer's control. Wieland claims that Commerce has previously adjusted its standard methodologies where failure to adjust would result in distortion of the margins. In support of its claim, Wieland cited *Melamine Chems., Inc. v. United States,* 2 Fed.Cir. (T) 57, 732 F.2d 924 (1984) (upholding Commerce's regulations for lagging exchange rates where margins were caused solely by currency fluctuations), *Flo-*

*ral Trade Council v. United States,* 12 CIT 1163, 704 F.Supp. 233 (1988) (affirming Commerce's decision to average U.S. prices where price fluctuations resulted from the perishability of the goods), and Commerce's final LTFV determination in *Brass Sheet and Strip from the Netherlands,* 53 Fed.Reg. 23,431 (Dep't Comm.1988) (changing the length of the period over which FMV is averaged to minimize the distortion by metal price fluctuations).

■ As noted above, substantial deference is granted to Commerce in both its interpretation of its statutory mandate and the methods it employs in administering the antidumping law. *Serampore,* 11 CIT at 873, 675 F.Supp. at 1360. In each of the three cases cited by Wieland, it was Commerce that decided to depart from its standard methodology. In two cases, Commerce's decision to depart was affirmed by the court as a reasonable exercise of discretion. *See Melamine,* 2 Fed.Cir. (T) at 66, 732 F.2d at 932; *Floral Trade,* 12 CIT at 1170, 704 F.Supp. at 240. In contrast, Commerce has decided that in this case no departure from its standard methodology was warranted. Under the same standard of deference, the court will sustain Commerce's decision absent a showing that the decision is unreasonable.

■ Under the current statutory scheme, Commerce is not required to use any specific methodology to account for potential distortion of margins caused by market price fluctuations. The statute does not require Commerce to make a transaction-by-transaction comparison in every case. Rather, it authorizes Commerce to use averaging and sampling techniques in determining the U.S. price or the FMV "whenever a significant volume of sales is involved or a significant number of adjustments to prices is required." 19 U.S.C. § 1677f–1(a)(1). Commerce has "exclusive" authority to select appropriate samples and averages so long as such samples and averages are "representative of the transactions under investigation." 19 U.S.C. § 1677f–1(b). Accordingly, the averages selected by Commerce will be held reasonable unless they are shown to be unrepresentative of the transactions under review.

Wieland claims that metal prices fluctuated as much as 156% during the period of review. *See* Wieland's Post Oral Argument Submission dated April 16, 1993, at 2. The figure is derived from comparing the copper price on August 22, 1986, the first day of the review period, with the copper price on December 31, 1987. Pub.R.Roll 1, Frame 288 (*Questionnaire Response,* at 12). However, because Commerce's standard methodology is to compare the price of an individual U.S. sale with a weighted average price of home market sales made in the same month, the controlling data in this case are not the price fluctuations over the entire review period, but the monthly price fluctuations. The record shows that in twelve out of the eighteen months under this review, the brass alloy prices fluctuated less than 10% each month, with four months having monthly price fluctuations below 6%. Wieland's Br.App. 3 (Fluctuations in Published Brass Alloy Prices During the Period of Review). Of the remaining six months, two had monthly fluctuations below 12% (January and September 1987), two below 16% (December 1987 and February 1988), one at 27.27% (January 1988) and one at 32.75% (November 1987). *Id.* Apparently, the most significant fluctuations occurred from November 1987 to February 1988, the last four months of the review period, whereas for the majority of the review period "metal values were relatively stable." *Final Results,* 56 Fed.Reg. at 60,089 (Comment 4).

The record contains a graph submitted by Wieland comparing the average monthly price with the daily metal prices of November 1987, the month that witnessed the greatest metal price fluctuation within the period of review. Conf.R.Roll 4, Frame 2193 (Wieland's Br., Aug. 9, 1990, at Ex. B). The graph shows that a comparison of a U.S. sale made at the lowest price in November with the monthly average price of the home market sales made in the same month could result in a distortion of price by 15 percent. *Id.* Conceivably, a greater distortion could occur when the comparison was made under the 90/60 day rule. For example, as the monthly low price of September 1987 is considerably lower than that of November 1987, *see* Wieland's Br.App. 3, when a U.S. sale

made at the lowest price of September is compared with the average price of November under the 90/60 day rule, it may result in a distortion of more than 15% of the average price.

However, despite the potential for distortion, the court has not found anything in the record showing the extent of any distortive comparisons that were actually made. Nor does the record reveal to what extent such distortive comparisons affected the final margins, which were attributable to multiple factors. Wieland claimed in the administrative proceeding that, according to its analysis of the data, the dumping margin changed "materially" when variations caused by metal value fluctuations were eliminated. Conf. R.Roll 4, Frame 2158 (Wieland's Br. Aug. 9, 1990). However, absent any specific evidence supporting Wieland's claim, the court cannot find the monthly averages used by Commerce as unrepresentative of the transactions under review.

In support of its contention that Commerce should deviate from its standard methodology in this case, Wieland relies on *Brass Sheet and Strip from the Netherlands,* 53 Fed.Reg. 23,431, a brass case in which Commerce recognized dramatic fluctuations of metal prices throughout the year of 1987 and averaged the home market prices over three periods (Feb. 1 through June 30, 1987, July 1 through Oct. 31, 1987, and Nov. 1 through Dec. 31, 1987) so as to minimize the distortive effect of daily metal price changes. Commerce explained that the three periods were chosen "because within each period, metal prices were relatively stable." *Id.* at 23,433. The court notes, however, that the price fluctuations over these extended periods were greater than that over the corresponding one-month periods. See Conf. R.Roll 4, Frame 1905–08 (*Supp. Questionnaire Response,* App. A–7). While price averaging over extended periods tended to reduce distortion in the Netherlands case because of the particular methodology Commerce used in that case, monthly averaging should produce more accurate comparisons for this case.

Furthermore, as Commerce pointed out, when U.S. sales are compared to monthly weighted-average contemporaneous home market sales, "the weighting process itself reduces the potential for distortion in price comparisons." *Final Results*, 56 Fed.Reg. at 60,089 (Comment 4). Although Wieland disagrees, it has not demonstrated the effect of the weighting process to be otherwise.

Given the relatively stable monthly prices for the majority of the period of review, and absent specific evidence in the record showing the weighted averages were unrepresentative of the transactions under review, the court finds that it was reasonable for Commerce to use its standard methodology.

### 2. Split–Priced Sales

■■■ Wieland challenges Commerce's use of BIA in determining the price for its split-priced home market sales. Split-pricing is one of the pricing options Wieland offers to its home market customers. Under this pricing method, a customer may establish a metal account with Wieland from which it can draw metal for any fabrication order of Wieland products. Wieland bills the customer for the metal at the time the metal account is credited. When a fabrication order is placed by the customer, Wieland draws from the customer's account the appropriate quantity of metal needed for the order and records the amount, in weight, of the metal drawn. The fabrication portion of the order is billed separately at the time of the delivery of the finished product. Since the metal in a customer's account has been purchased at various prices on various dates and may be used to fill orders for products other than brass sheets and strips, Wieland claims that it does not, and has no business reason, to keep a record of the actual metal price for any particular split-priced sales.

In response to Commerce's request for the actual metal price of split-priced sales, Wieland submitted a constructed price which consisted of the official German metal price in effect on the date of sale plus the fabrication price and minus the value of a metal discount and an early payment discount. Commerce rejected this constructed price and, as BIA, accepted petitioner's information with respect to the total sale price and added the value of the two discounts back into each home market sale. *Final Results*, 56 Fed.Reg. at 60,091 (Comment 12).

Under the current statute, Commerce is required to use best information otherwise available whenever a party "refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation." 19 U.S.C. § 1677e(c) (1988). According to Commerce, it used the BIA in this case because Wieland failed to provide "the actual metal price charged to home market customers purchasing on a split-priced basis who were billed separately for the metal value portion of the sale" and failed also to provide "an acceptable constructed price that was representative of actual prices charged." *Final Results*, 56 Fed.Reg. at 60,091 (Comment 12).

Wieland asserts that Commerce may not resort to BIA when its requested information does not exist. In support of its position, Wieland relies on *Olympic Adhesives, Inc. v. United States*, 8 Fed.Cir. (T) 69, 899 F.2d 1565 (1990), which held that Commerce's resort to BIA was not justified where the respondent did not provide information of sales because there were in fact no sales.

Wieland's case, however, differs from that of *Olympic Adhesives*. In *Olympic Adhesives*, the respondent had no sales and the court found "no substantial evidence indicating that [the respondent] 'refused' or 'was unable' to supply the ITA with information within the meaning of those terms in the statute." *Id.* at 79, 899 F.2d at 1574. In contrast, Wieland did have sales but was unable to produce the information requested since it did not keep a record of such information under its particular pricing system. Such inability itself, however, is not excepted from the application of BIA under the statute. *See* 19 U.S.C. § 1677e(c). *See also, Allied–Signal Aerospace Co. v. United States*, 11 Fed.Cir. (T) ——, 996 F.2d 1185 (1993) (a respondent that failed to provide Commerce with requested information due to its particular costing system and limited accounting resources, and not due to its refusal to cooperate, was subject to a less adverse BIA rate under Commerce's two-tier BIA

methodology). Although Wieland maintains that BIA should not be applied, its request that Commerce use its constructed price would result in Commerce's using information provided by Wieland as BIA.

■ Wieland contends that Commerce's rejection of its constructed price is an unreasonable departure from its methodology in the LTFV investigation because Commerce failed to take into account Wieland's reliance interest and provided no explanation for the departure. Wieland relies on *Shikoku Chems. v. United States*, 16 CIT ——, 795 F.Supp. 417 (1992), which held it was unreasonable for Commerce to alter a methodology that had been consistently used in the LTFV investigation and four previous administrative reviews, where the fact pattern remained unchanged and the error discovered in the methodology was of little significance.

The situation in this case is distinguishable from that in *Shikoku*. The change of methodology in *Shikoku* was after several administrative reviews and the party had developed a strong reliance upon the methodology, whereas the change of methodology in this case was made in the first administrative review which assesses the actual dumping margin for the first time. Commerce may accept a respondent's reporting methodology under the strict time limits of the LTFV investigation. However, that does not preclude Commerce from re-evaluating the reporting methodology based on information received during the first administrative review. Commerce is not bound by the reporting methodology verified and accepted in the LTFV investigation if it has reason to believe that a different methodology permits a more accurate assessment of current margins. *See Rhone Poulenc, Inc. v. United States*, 8 Fed. Cir. (T) 61, 67, 899 F.2d 1185, 1191 (1990) (Commerce must implement "the basic purpose of the statute—determining current margins as accurately as possible.").

The question is whether Commerce's rejection of Wieland's constructed price and its application of the BIA are supported by substantial evidence on the record and are in accordance with law. In its final determination, Commerce stated:

Respondent failed to provide the requested information and failed to provide an acceptable constructed price that was representative of actual prices charged. In addition, the Wieland Group reported early payment and metal discounts on all split-pricing metal purchases. However, the Wieland Group failed to demonstrate that it actually received these discounts on all split-pricing metal purchases. Therefore, we accepted information submitted by petitioner as BIA with respect to the total sale price and adjusted all home market prices to levels applicable to home market sales not covered by split-pricing agreements by adding the metal discount and early payment discount to each home market sale.

*Final Results*, 56 Fed.Reg. at 60,091 (Comment 12).

Commerce did not explain in this statement why it found the constructed price "unrepresentative" of actual prices. Although Commerce mentioned, as an additional reason for rejecting the constructed price, that Wieland failed to demonstrate the actual receipt of the two discounts included in the constructed price, it is unclear whether this was also Commerce's reason for finding the constructed price unrepresentative of actual prices. The court has found no additional explanation in the record. Since Commerce has not clearly set forth the reasons for its finding, the court is unable to determine whether Commerce's decision to reject the constructed price is supported by substantial evidence in the record and is otherwise in accordance with law.

In addition, the parties disagree as to how the BIA was actually applied by Commerce. Wieland contends that Commerce added the value of the two discounts to all of Wieland's home market sales, including both split-priced and non-split-priced sales, and that such broad application of BIA is unwarranted in this case. Government, on the other hand, claims that it is unclear whether Commerce actually added the value of the two discounts to all the home market sales. Accordingly, Government requests a remand to determine that fact and for Commerce to provide an explanation if it indeed added the value of the two discounts to all the home market

sales. The court grants the remand, with the instruction that if Commerce added the two discounts to non-split-priced sales by error, it shall correct the error on remand. In addition, on remand Commerce shall fully explain the reasons for its finding that Wieland's constructed price was unrepresentative of actual prices.

### 3. Early Payment Discount

■ Wieland granted early payment discounts to its home market customers paying within a specified period of time. Conf. R.Roll 2, Frame 224 (*Questionnaire Response*, App. B–3(c)). In reporting its home market sales, Wieland reduced the prices by deducting an average early payment discount, which was calculated by dividing the total early payment discounts paid by the total value of its sales. Conf.R.Roll 4, Frames 1948–49 (*Supp. Questionnaire Response*, App. B–3(c)). Commerce denied Wieland's claim for early payment discount, stating:

> The Department generally makes an adjustment if discounts, granted pursuant to accurately and adequately described programs, are properly reported on a sale or customer-specific basis and are directly associated with the products or sales under consideration. Although the Department has the discretion to allow adjustments based on allocations rather than invoice-specific adjustments where the allocation methods were reasonable and consistent, we are disallowing this claim (See Department's Position, Comment 12).

*Final Results*, 56 Fed.Reg. at 60,091 (Comment 14). Comment 12 of the Final Results explains that Commerce disallowed the early payment discount for the split-priced sales because Wieland failed to demonstrate that its customers actually received such discount. *Id.* (Comment 12).

Wieland asserts that Commerce's denial of its early payment discount claim is unsupported by the record evidence and that Commerce did not provide a reasonable explanation for its decision. Wieland's contention is without merit.

Commerce made it clear in its final determination that it "generally makes an adjustment if discounts ... are properly reported on a sale or customer-specific basis...." *Id.* (Comment 14). The record shows that, instead of being transaction-specific, Wieland reported an "average" early payment discount based on its sales of all products in the home market. *See* Conf.R.Roll 4, Frame 1948 (*Supp. Questionnaire Response*, App. B–3(c)). Furthermore, Wieland claimed early payment discount on all of its home market sales despite its own submission stating that [[ ]] Conf.R.Roll 2, Frame 36 (*Questionnaire Response*, at 10). Under these circumstances, it is reasonable for Commerce to deny Wieland's early payment discount claim. The court finds that Commerce's decision is supported by the record evidence and that Commerce has provided a reasonable explanation for its decision.

Wieland further claims that Commerce inflated the FMV by double-counting the value of early payment discount because, in addition to denying the early payment discount to all home market sales, Commerce also added the value of early payment discount to all home market sales as BIA for split-priced sales. Since the court is remanding the issue of Commerce's application of BIA in the split-priced sales, it is unnecessary to address the issue of double-counting on early payment discount here.

### 4. Imputed Credit Expenses

■ Commerce made an adjustment to both the FMV and the U.S. price for Wieland's credit expenses on sales. Because Wieland did not have any short-term financing during the period of review, Commerce imputed the credit expenses for both home market sales and U.S. sales. Commerce explained:

> Respondent did not furnish actual credit interest rates applicable to home market sales or U.S. sales. In its response, the Wieland Group submitted a range of short-term interest rates offered by its banks during the [period of review]. Since we do not have actual interest rates identified for sales to each market, for purposes of these final results, as BIA for the credit expense adjustments, we have used the lowest interest rate in the range for home market

sales and the highest interest rate in the range for U.S. sales.

*Final Results,* 56 Fed.Reg. at 60,090 (Comment 8), as amended by *Amendment to Final Results,* 57 Fed.Reg. at 276.

Wieland challenges Commerce's use of BIA as not in accordance with law. Wieland claims that it was unable to furnish any actual interest rates because it had no actual borrowing during the review period, and Commerce may not resort to BIA in this situation under *Olympic Adhesives,* 8 Fed. Cir. (T) 69, 899 F.2d 1565. According to Wieland, Commerce should apply the same interest rate to both its home market sales and U.S. sales.

Government argues that Commerce correctly resorted to BIA "because [Wieland] failed to substantiate its reported imputed credit expense claim." Gov't Br. at 75. According to Government, Wieland did not provide any support for the reported short-term interest rates. When Commerce requested further information about the sources of the figures and the methodology used to allocate the imputed credit expenses, Wieland did not respond; instead, it "merely resubmitted the data from the original response with no additional explanation." *Id.* at 77. Wieland counters, however, that Government's argument is a post hoc rationalization since Commerce clearly stated that it used the BIA because it "[did] not have actual interest rates identified for sales to each market." *Final Results,* 56 Fed.Reg. at 60,090 (Comment 8).

■ "The courts may not accept counsel's post hoc rationalizations for agency action...." *Burlington Truck, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962). "The grounds upon which an administrative order must be judged are those upon which the record discloses that [agency] action was based." *SEC v. Chenery Corp.,* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943)). Since Commerce based its use of BIA on Wieland's failure to furnish actual interest rates, rather than Wieland's failure to "substantiate its reported imputed credit expense claim" as argued by Government, the court may not judge Commerce's action on the basis of Government's rationale.

The court remands the issue to Commerce to reconsider its application of the BIA in calculating the imputed credit expenses, or, in the alternative, provide further explanations for such application.

### 5. Adjustment for Differences In Merchandise

■ Where similar, rather than identical, merchandise is used in determining the FMV, Commerce is required to make allowance for differences in merchandise if it is established to its satisfaction that any price differential between the U.S. market and the home market is wholly or partly due to such differences. 19 U.S.C. § 1677b(a)(4) (1988); 19 C.F.R. § 353.57 (1993). In deciding what is a reasonable allowance, Commerce normally will consider the differences in the cost of production. 19 C.F.R. § 353.57(b).

In determining the FMV, Commerce used similar merchandise matched on the basis of five primary characteristics: form, coating, grade, gauge and width. Wieland did not provide Commerce with the information on cost differences attributable to grade, gauge and width. Consequently, Commerce used the London Metal Exchange prices in making the difference-in-merchandise adjustment for grade, and used the highest weighted-average margin for any member of the Wieland Group as BIA for those sales without gauge or width matches. *See Final Results,* 56 Fed.Reg. at 60,089 (Comments 5 and 6).

Aside from the five primary characteristics, Wieland requested difference-in-merchandise adjustments for twelve secondary characteristics of its merchandise sold in the home market, such as camber, non-earing, and suitability for etching. According to Wieland, these special characteristics made the merchandise more expensive to produce, therefore adjustments for these characteristics should be allowed. Commerce denied Wieland's request on the grounds that (1) Wieland reported standard cost data instead of actual cost data and failed to segregate the total material cost, the direct labor cost and the direct factory overhead cost of each of its claims as requested by Commerce, and (2) Wieland failed to provide the requested dif-

ference-in-merchandise data for the primary characteristics of gauge and width. *Final Results*, 56 Fed.Reg. at 60,088 (Comment 1).

Wieland challenges Commerce's denial of the difference-in-merchandise adjustment for the special characteristics as unreasonable. It claims that Commerce previously accepted the same reporting methodology in the LTFV determination and did not provide any notice or explanation of the alleged reporting deficiencies in the administrative review.

Contrary to Wieland's assertion, the record shows that Commerce in the original questionnaire requested Wieland to submit separate lists quantifying cost differences between home market and U.S. product models, including a list of the total materials, direct labor, and direct factory overhead cost differences for each comparison model. Pub. R.Roll 1, Frame 55 (*Questionnaire*, at B–4). After Wieland submitted its response, Commerce issued a deficiency letter which requested the same list of cost differences for each comparison model as in the original questionnaire. Pub.R.Roll 1, Frame 1136 (*Supp. Questionnaire*, Q. 42). In addition, Commerce asked for an explanation as to why Wieland would seek the adjustment for the secondary characteristics that had not been identified in Wieland's product comparison hierarchy and requested Wieland to report the secondary characteristics in the production comparison hierarchy along with the five primary characteristics. *Id.* at Frame 1137 (Qs. 47, 48). Thus, Wieland was given sufficient notice of Commerce's requirements and ample opportunity to comply with Commerce's specific requests.

Wieland further contends that it is unreasonable for Commerce to deny one adjustment (for special characteristics) because the information about another adjustment (for gauge and width) was not provided. The two adjustments, however, are both for physical differences in merchandise allowable under the same provision of the statute and regulations. "The law does not permit a party to pick and choose information it wishes to present to the agency...." *Brother Indus., Ltd. v. United States*, 15 CIT 332, 340, 771 F.Supp. 374, 383 (1991). Given its well-established authority to reject partial informa-

tion and resort to BIA where complete information is not provided, *see Chinsung Indus. Co. v. United States*, 13 CIT 103, 107, 705 F.Supp. 598, 602 (1989); *Pistachio Group of The Ass'n of Food Indus. Inc. v. United States*, 11 CIT 668, 679, 671 F.Supp. 31, 40 (1987), Commerce is within its discretion to deny Wieland's claim for the difference-in-merchandise adjustment where it found the claim was based on information selectively provided by Wieland.

For the reasons stated above, the court holds Commerce's denial of Wieland's difference-in-merchandise adjustment claim for secondary characteristics is supported by substantial evidence on the record and is in accordance with law.

### 6. Quantity Discount Adjustment

██ Wieland challenges Commerce's denial of its claim for a quantity discount adjustment on its home market sales. The adjustment for differences in quantities sold is provided by 19 U.S.C. § 1677b(a)(4), which authorizes Commerce in determining the FMV to make "due allowance" for differences in quantities sold if it is established to Commerce's satisfaction that the difference between the U.S. price and the FMV is "wholly or partly due to" the difference in commercial quantities in sales to the U.S. market and the home market. Commerce's regulation implementing the statute provides that the Secretary will calculate the FMV based on sales with quantity discounts if "[t]he producer demonstrates to the Secretary's satisfaction that the discounts reflect savings specifically attributable to the production of the different quantities." 19 C.F.R. § 353.55(b)(2) (1993).

Wieland claims that because the average order of its products sold in the United States was considerably larger than that sold in the home market, Commerce should have granted a home-market quantity discount adjustment for the savings of variable set-up costs and other direct costs based on the number of orders, such as the cost of data processing, production planning, billing and shipping and handling. According to Wieland, it is entitled to such quantity discount because the savings on variable set-up costs and processing costs are "savings specifically

attributable to the production of the different quantities" under § 353.55(b)(2).

In denying Wieland's quantity discount claim, Commerce provided the following explanation:

As stated in Brass Sheet and Strip from the Netherlands, 53 FR 2341 [sic] (1988), "the controlling requirement of § 353.14 (353.55(a) under the new antidumping regulations) is that, to be eligible for a quantity-based adjustment, a respondent must demonstrate *a clear and direct correlation between price differences and quantities sold or costs incurred.*" The exporter must clearly demonstrate that discounts are warranted on the basis of savings which are specifically attributable to longer production runs. The Department maintains that the Wieland Group failed to take into account price differences due to differences in alloy composition and gauge and width. In addition to failing to hold all variables, except the quantity variable, constant, [Wieland] has not adequately demonstrated a correlation between prices and savings specifically attributable to different production quantities.

*Final Results,* 56 Fed.Reg. at 60,089 (Comment 2) (emphasis added).

Wieland asserts that Commerce's conclusion is not supported by the record evidence because Wieland has demonstrated in the record a near perfect correlation between prices and quantities sold and has provided proof that it held all variables constant except the quantity. Wieland further contends that it was unreasonable for Commerce to deny the quantity discount because Commerce had verified and accepted the same quantity discount claim in the LTFV determination and Wieland, relying on Commerce's previous decision, had maintained the same reporting methodology in the administrative review.

Wieland presented two tables to demonstrate that "there is a clear and undeniable correlation between price and quantity." Conf.R.Roll 4, Frames 2137–38 (Wieland's Br., Aug. 9, 1990, at 13–14). Table 1 presents a comparison of the unit prices charged by Wieland for sales in different quantity groups based on form (strips or sheets) and coating (tinned or non-tinned). *Id.* at Frame 2141. Table 2 shows the same comparison after the price differences attributable to special characteristics of the merchandise are subtracted from all sales with special characteristics. *Id.* at Frames 2139–40, 2142. These two tables, however, do not reflect the price differences attributable to alloy composition, gauge and width. Such being the case, Commerce had reason to find that Wieland failed to "hold all variables, except the quantity variable, constant" and "[had] not adequately demonstrated a correlation between prices and savings specifically attributable to different production quantities." *Final Results,* 56 Fed.Reg. at 60,089 (Comment 2).

Under the statute and regulations, Commerce is required to make allowance for differences in quantities only if it is established to the satisfaction of Commerce that the difference between the U.S. price and the FMV is due to the difference in quantities sold. *See* 19 U.S.C. § 1677b(a)(4); 19 C.F.R. § 353.55(b)(2). Since Wieland did not establish its quantity discount claim to the satisfaction of Commerce, Commerce was within its authority to deny Wieland's claim.

As already discussed above, Commerce may reject the reporting methodology it verified and accepted in the LTFV investigation if it has reason to believe that the same methodology does not permit an accurate assessment of dumping margins in the first administrative review. Commerce's decision to reject the previously-accepted methodology will be upheld if it is supported by substantial evidence in the record and is otherwise in accordance with law. The court holds that Commerce's denial of Wieland's claim for the quantity discount adjustment is supported by substantial evidence on the record and is in accordance with law.

### 7. Further Processed Merchandise

During the period of review, Wieland had sales of merchandise based on exporter's sales price (ESP) which were subject to further processing by its subsidiary in the United States. This processing involved slitting wide-width material into narrow-width material. To compare these ESP sales with

home market sales, Commerce reduced the ESP calculations by the value added in the United States as provided by the statute. *See* 19 U.S.C. § 1677a(e) (1988). According to Commerce, however, because Wieland failed to report product specifications for the value-added merchandise on an "as imported" basis and instead provided the information on an "as sold" basis, Commerce, as BIA, made comparisons on an "as sold" basis. *Final Results,* 56 Fed.Reg. at 60,089 (Comment 3).

Wieland asserts that Commerce improperly compared the ESP sales with home market sales because (1) the computer program used by Commerce contained an error, a "WIDTH" key specifically, that prevented Commerce from comparing the reduced ESP sales price with the price of the comparable wide-width merchandise sold in the home market, and (2) Commerce improperly resorted to BIA since it did not specifically request Wieland to report the ESP sales on an "as imported" basis. Furthermore, Wieland claims that it should be given an opportunity to submit new difference-in-merchandise information on any sales that do not have matches after Commerce corrects the computer error, because such no matches will result solely from Commerce's change in matching methodology and not from Wieland's failure to provide the information.

Commerce concedes that the computer program does contain an error as asserted by Wieland and agrees to correct the error by eliminating the "WIDTH" key should the court so order. Gov't Br. at 90. Commerce, however, insists that it is justified in resorting to BIA for any remaining no matches after the correction of the computer error, and that Wieland should not be allowed to submit any new information.

The record shows that in the original questionnaire Commerce requested information about the value-added merchandise "prior to [the] sale to an unrelated party in the United States." Pub.R.Roll 1, Frame 73 (*Questionnaire,* at C–11). Subsequently in the deficiency letter, Commerce specifically asked: "In what form is the product that is used for further processing imported?" Pub.R.Roll 1, Frame 1138 (*Supp. Questionnaire,* Q. 57).

Despite Commerce's explicit inquiries, Wieland provided the information about the value-added merchandise only on an "as sold" basis, that is, in the form the merchandise was sold to an unrelated party in the United States. Given Wieland's failure to provide the requested information, Commerce was justified in resorting to BIA. *See* 19 U.S.C. § 1677e(c). Further, the court does not find that the correction of a computer error constitutes a "change in matching methodology" by Commerce. Should Commerce lack information about any no-match sales after the correction of the computer error, it will be attributable to Wieland's failure to submit the correct information as originally requested by Commerce.

Wieland's request for an opportunity to submit new information is denied. The court remands the issue to Commerce to correct the computer programming error with the instruction that Commerce may use BIA for any remaining no-match sales.

## CONCLUSIONS

In accordance with the foregoing opinion, this case is remanded to Commerce to (1) provide an explanation for its departure from its normal practice of making exact alloy matches in determining such or similar merchandise; (2) provide evidence justifying the use of the long-term interest rate for the consignment credit expense or, in the alternative, redetermine the interest rate to be used and, if necessary, redetermine credit expenses on consignment inventory so as to avoid any double counting; (3) correct the miscalculation in the deduction of home market commissions with respect to purchase price sales; (4) correct errors in its computer program with respect to inland freight insurance charges; (5) provide reasons for its finding that Wieland's constructed price on split-priced sales was unrepresentative of actual prices charged, and determine whether Commerce actually added the value of early payment discount and metal discount to non-split-priced sales and, if so, explain the reasons for so doing or correct the error if it was done by error; (6) reconsider its application of BIA in calculating the imputed credit expenses or, in the alternative, provide fur-

ther explanation for such application; and (7) correct the computer error in making the adjustment for merchandise further processed in the United States.

Commerce shall file its remand results with the court within 60 days. Any party contesting the remand results shall file comments with the court within 30 days of the remand results. Commerce may file its response to any comments within 15 days of the comments.