**Slip Op. 02-109**

**United States Court of International Trade**

<table>
<tr><td>

RHODIA, INC.,

              Plaintiff,

      v.

UNITED STATES,

              Defendant

              and

JILIN PHARMACEUTICAL CO., LTD.;
SHANDONG XINHUA PHARMACEUTICAL FACTORY
CO., LTD.,

              Defendant-Intervenors.

</td><td>

Before: Pogue, Judge

Consol. Court No.
00-08-00407

</td></tr>
</table>

[ITA decision affirmed.]

Decided: September 9, 2002

Williams Mullen Clark & Dobbins (James R. Cannon, Jr., Julia K. Bailey, William E. Pomeranz) for Plaintiffs.

Robert D. McCallum, Jr., Assistant Attorney General, David M. Cohen, Director, Lucius B. Lau, Assistant Director, Ada E. Bosque, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice; Emily Lawson, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Of Counsel, for Defendant.

White & Case (William J. Clinton, Adams C. Lee) for Defendant-Intervenor Jilin Pharmaceutical Co., Ltd.

Garvey, Schubert & Barer (William E. Perry, John C. Kalitka) for Defendant-Intervenor Shandong Xinhua Pharmaceutical Factory, Ltd.

**OPINION**

**Pogue, Judge**: On November 30, 2001, this Court in <u>Rhodia v. United States</u>, 25 CIT __ , 185 F. Supp. 2d 1343 (2001)("<u>Rhodia I</u>"),[1] remanded the Department of Commerce's final determination in <u>Sales at Less than Fair Value: Bulk Aspirin from the People's Republic of China</u>, 65 Fed. Reg. 33,805 (May 25, 2000), <u>as amended</u>, 65 Fed. Reg. 39,598 (June 27, 2000), and the accompanying <u>Issues and Decision Memorandum</u>, P.R. Doc. No. 155 (May 17, 2000). The remand order directed Commerce to review the record evidence pertaining to the calculation of factory overhead, selling, general and administrative expenses (SG&A) and profit.[2] This Court now reviews Commerce's <u>Redetermination Pursuant to Court Remand: Rhodia v. United States</u> (Mar. 29, 2002)("Remand Determination"). Jurisdiction lies under 28 U.S.C. § 1581(c) (2000).[3]

**Background**

This case involves the imposition of antidumping duties on imports of bulk acetylsalicylic acid, commonly referred to as

---

[1]Familiarity with the Court's earlier opinion is presumed.

[2]Commerce also asked for and was granted a voluntary remand to correct the calculation of the overhead ratio by removing traded goods from the denominator. <u>Rhodia I</u>, 25 CIT at __ , 185 F. Supp. 2d at 1357.

[3]Citations to the administrative record include references to public documents from the original inquiry ("P.R. Doc."); proprietary documents from the original inquiry ("C.R. Doc."); public documents from the remand inquiry ("R.P.R. Doc.") and proprietary documents from the remand inquiry ("R.C.R. Doc.").

aspirin, from the People's Republic of China ("PRC").[4]   In the Final Determination, Commerce found the PRC to be a nonmarket economy ("NME") country and therefore selected India as the surrogate market economy country in accordance with 19 U.S.C. § 1677b(c)(4).  In calculating the antidumping duty, Commerce derived a normal value for PRC producers of bulk aspirin from three Indian surrogate companies; Alta Laboratories, Ltd. ("Alta"), Andhra Sugars, Ltd. ("Andhra"), and Gujarat Organics, Ltd. ("Gujarat"), which produced salicylic acid, salicylic acid derivatives, or aspirin.   Commerce assumed that these surrogates were not as integrated as the PRC producers and therefore claimed that the PRC producers would have a higher overhead-to-raw material ratio than the surrogate producers.   To compensate, Commerce applied the overhead ratio calculated from the Indian surrogate producers' data twice.   Commerce also calculated overhead, SG&A, and profit ratios using a weighted average.

This Court remanded Commerce's determination because Commerce did not identify record evidence supporting its assumption that the surrogates were less integrated than the PRC producers or explain its reasons for departing from the normal practice of using a simple average to calculate the overhead, SG&A, and profit ratio.

---

[4]Bulk aspirin is produced by combining two main ingredients, salicylic acid and acetic anhydride, which react to form acetylsalicylic acid or aspirin.

**Discussion**

## I.   Integration Level of Indian Producers[5]

In the <u>Final Determination</u>, Commerce assumed that the Indian

surrogate producers were more representative of input producers[6]

---

[5]Rhodia filed both a response to the Department's Remand Determination and Jilin's remand comments, as well as, a motion for leave to file a reply brief with a proposed reply brief attached.  Jilin opposes these later filings.  According to Jilin, this court's remand order "limited the opportunity to file response comments to the Department, and did not specifically provide parties with the opportunity to file comments in response to other parties' remand comments."  Jilin's Opp'n to Rhodia's July 15, 2002 Mot. for Leave to File a Reply Br. and Mot. to Strike Rhodia's May 28, 2002 Comments in Opp'n to Jilin's Remand Comments at 2.   The original opinion "granted [the parties] 30 days to file comments on the remand determination.  The Department may respond to any comments filed within 20 days." <u>Rhodia I</u>, 25 CIT at __, 185 F. Supp. 2d at 1358.  "Motions to strike are extraordinary measures," <u>Acciai Speciali Terni SPA v. United States</u>, 24 CIT __, __, 120 F. Supp. 2d 1101, 1106 (2000), "not favored by the courts and infrequently granted." <u>Jimlar Corp. v. United States</u>, 10 CIT 671, 673, 647 F. Supp. 932, 934 (1986).  Such motions are only granted when there is a "flagrant disregard of the rules of the court," as when "the brief demonstrates a lack of good faith, or . . . the court would be prejudiced or misled by the inclusion in the brief of the improper material." <u>Id.</u>  Here, Rhodia interpreted the remand order as allowing all parties to respond.  Rhodia, however, also "respectfully request[ed] leave to file its Opposition to Remand Comments of Jilin . . . ."  Because Rhodia's opposition was filed within the time limits of the remand order and addresses issues raised by Jilin yet not previously addressed by Rhodia, we deny Jilin's motion to strike.  Furthermore, Jilin did not even file its motion to strike until 49 days after Rhodia's Opposition was filed.  We also accept Rhodia's Motion for Leave to File Reply Brief as "it is in the interest of the court to hear all the parties' arguments expressed as thoroughly and clearly as possible." <u>Borden, Inc. v. United States</u>, 22 CIT 233, 248 n.11, 4 F. Supp. 2d 1221, 1235 n.11 (1998).

[6]In this investigation, Commerce used the term "input producer" to refer to a company that only produces aspirin inputs, such as salicylic acid (made from phenol and carbon

than of fully integrated producers such as those found in the PRC. Less integrated producers, according to Commerce, have lower overhead rates. As a result, Commerce applied an overhead ratio at more than one stage of the production process. Commerce did not explain, however, why a fully integrated producer has a higher overhead ratio nor cite any evidence demonstrating that the surrogate producers were in this instance less integrated than the PRC producers.

On remand, Commerce adopted the opposite position and applied the overhead ratio once, at the final stage of production. Commerce followed this Court's understanding that "[w]hile salicylic acid is an input in aspirin production, aspirin is also a derivative of salicylic acid." Rhodia I, 25 CIT at __, 185 F. Supp. 2d at 1349. Commerce therefore reasoned that because the three Indian surrogates produce at least one major aspirin input, such as salicylic acid, as well as some salicylic acid derivatives, the surrogates were representative of the PRC producers' experience. Since Andhra, one of the Indian surrogates, also produces aspirin, Commerce's conclusion was further supported.

Commerce noted that the production of a chemical derivative necessarily requires some further processing. Remand Determ. at 5

---

dioxide) or acetic anhydride (made from acetic acid and other materials);a "fully integrated producer" produces salicylic acid, acetic anydride and the final aspirin product, bulk acetylsalicylic acid.

(citing to The Cassell Dictionary of Chemistry 59 (1998), which defines derivatives as "a chemical compound derived from some other compound by a straightforward reaction, which usually retains the structure and some of the chemical properties of the original compound"). Even though Commerce was unable to ascertain whether the further processing used by the Indian surrogates to produce the derivatives was "major or minor," Commerce found that "there is no evidence on the record which shows that the further processing is not commensurate with the additional stage of processing Jilin and Shandong employ to produce aspirin." Remand Determ. at 5. Based on the record, Commerce could not "rule out that the production of derivatives by [the surrogates] may mean that they are as integrated as Jilin and Shandong." Id.

Furthermore, Commerce determined that the quantity of aspirin a company produces "is not probative of whether the company should be viewed as an integrated producer." Id. at 6. Rather, Commerce found that as Andhra produces a small percentage of aspirin as well as other chemicals, "because [it] produces both acetic anhydride and aspirin, we cannot conclude that the company's overhead amount better represents the experience of an upstream input producer." Id.

Based on this analysis of the evidence, Commerce refrained from adjusting the Indian surrogate producers' data in its calculation of the normal value on remand. This decision is

consistent with Commerce's normal practice because Commerce does not generally adjust the surrogate values used in the calculation of factory overhead.  See Notice of Final Determination of Sales at Less Than Fair Value: Polyvinyl Alcohol from the People's Republic of China, 61 Fed. Reg. 14,057, 14,060 (Mar. 29, 1996); Synthetic Indigo from the People's Republic of China, 65 Fed. Reg. 25,706, 25,706-07 (May 3, 2000); Certain Helical Spring Lock Washers from the People's Republic of China, 64 Fed. Reg. 13,401, 13,404 (Mar. 18, 1999); Certain Helical Spring Lock Washers from the People's Republic of China, 65 Fed. Reg. 31,143, 31,143 (May 16, 2000); Notice of Final Determination of Sales at Less Than Fair Value: Collated Roofing Nails from the People's Republic of China, 62 Fed. Reg. 51,410, 51,413, 51,417 (Oct. 1, 1997). Rather, once Commerce establishes that the surrogate produces identical or comparable merchandise, closely approximating the nonmarket economy producer's experience, Commerce merely uses the surrogate producer's data.  19 U.S.C. § 1677b(c)(4) (2000); 19 C.F.R. § 351.408(c)(4) (2001). Furthermore, Commerce is neither required to "duplicate the exact production experience of the Chinese manufacturers," Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999), nor undergo "an item-by-item analysis in calculating factory overhead." Magnesium Corp. of Am. v. United States, 166 F.3d 1364, 1372 (Fed. Cir. 1999).  Moreover, Commerce need not use "perfectly conforming information," only comparable information.  Antidumping

Duties; Countervailing Duties: Notice of Proposed Rulemaking and Request for Public Comments, 61 Fed. Reg. 7,308, 7,344 (Feb. 27, 1996). Therefore, on remand, Commerce acted consistently with its normal practice by refraining from adjusting the Indian surrogate producers' data.

In Polyvinyl Alcohol from the PRC, Commerce was faced with a situation similar to the one before the court here. 61 Fed. Reg. 14,057, 14,060 (Mar. 29, 1996). The petitioners in that investigation argued that the application of factory overhead at the final stage of production, rather than to the upstream stages, would understate normal value. Id. Just as it determined here, in Polyvinvyl Alcohol from the PRC, Commerce found that "there [was] no evidence on the record to indicate that the Indian producers are any less vertically integrated than the PRC PVA producers." Id. Commerce also held that there was "no basis to assume that applying [a] factory overhead percentage once, at the final stage of production of the PRC producers, undervalues factory overhead." Id.

Unless there is substantial evidence in the record which supports a finding that the surrogate producers are less integrated that the PRC producers, and as a result have a lower overhead ratio, Commerce cannot depart from its standard practice. Rhodia claims that by upholding this practice, the Court will be permitting Commerce to make inferences adverse to the domestic producer. Here, however, Commerce is not making an adverse

inference, but is simply following its standard practice of using data from a surrogate producer of identical or comparable merchandise.

## II.  Weighted Average v. Simple Average

In the Final Determination, Commerce calculated surrogate overhead, SG&A, and profit ratios using a weighted average of the three Indian producers; Alta, Andhra, and Gujarat.  This Court found that "[i]n almost every antidumping investigation where Commerce uses only a few surrogate companies, Commerce applies a simple average to derive overhead, SG&A, and profit," and remanded to Commerce to either conform with its usual practice or "explain the reasons for its departure."  Rhodia I, 25 CIT at __, 185 F. Supp. 2d at 1350(quoting Hussey Copper, Ltd. v. United States, 17 CIT 993, 997, 834 F. Supp. 413, 418 (1993)).

On remand, Commerce agreed that its "usual practice is to use a simple average when combining data for these types of calculations" and found "no facts in this proceeding that warrant deviation from that practice." Remand Determ. at 7.  Accordingly, Commerce recalculated the overhead, SG&A, and profit ratios using a simple average. Id.  Both Alta and Gujarat, however, had negative profits. Id.  Rather then set these losses at zero and include them in the simple average, as was done in Commerce's draft Remand Determination, Commerce excluded this information from the profit

calculation. <u>Id.</u> Therefore, the profit ratio calculation only included data from Andhra's financial statement. <u>Id.</u> Jilin claims that Commerce's exclusion of Alta and Gujarat's profit information is unreasonable, inconsistent with the remand order, and contrary to the plain language of the statute. Jilin's Comments On Remand Determ. at 7-8 ("Jilin's Remand Comments").[7]

Neither the controlling statute nor the regulations specify how to determine the profit component of constructed value. 19 U.S.C. § 1677b(c)(1) (2000) provides that Commerce shall

> determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit . . . [T]he valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate....

<u>Id.</u> Pursuant to 19 C.F.R. § 351.408(c)(4) (2001), Commerce is directed to "normally . . . use nonproprietary information gathered from producers of identical or comparable merchandise in the surrogate country." <u>Id.</u> The statute and regulations refer only to "an amount" for profit that is added to the factors of production and are silent with respect to the calculation of profit. §

---

[7]Jilin also argues that Commerce's "practice of excluding zero profit companies was developed almost entirely after the issuance of <u>Aspirin</u>." Jilin's Remand Comments at 11. The focus of this court's inquiry, however, is whether the methodology applied on redetermination is within the agency's discretion; whether the agency has explained its reasons for its practice; and whether the practice is reasonable and in accordance with law.

1677b(c)(1); 19 C.F.R. § 351.408(c)(4). As even Jilin concedes, "[t]he statutory language provides no limitation that the profit amount must be calculated in any particular way." Jilin's Remand Comments at 9. Because the statute is ambiguous, we review Commerce's interpretation to determine whether it is reasonable.[8]

Jilin cites to this Court's reference in Rhodia I to Notice of Final Determination of Sales at Less Than Fair Value: Bicycles from the Peoples Republic of China, 61 Fed. Reg. 19,026, 19,039 (Apr. 30, 1996) in support of its argument that Commerce's decision to exclude surrogates with negative profits from its calculation is unreasonable. See Jilin's Remand Comments at 7-9. According to Jilin, Bicycles stands for the proposition that Commerce must use a simple average unless it presents evidence that the surrogate values are not equally representative of the surrogate experience. Id. at 7. Jilin claims that the exclusion of zero profits from a

_____

[8]Statutory interpretations articulated by Commerce during its antidumping proceedings are reviewed using the traditional two step analysis articulated in Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842-43 (1984). See Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001); cf. Skidmore v. Swift & Co., 323 U.S. 134, 139-40 (1944)(explaining the less deferential "persuasive" analysis); see also United States v. Mead Corp., 533 U.S. 218, 226-27(2001). In determining whether Commerce's statutory interpretation is in accordance with law, "first, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Chevron, 467 U.S. at 842-43. If the statute is ambiguous, then the court asks whether the agency's interpretation of the statute is reasonable. Id. at 843.

simple determination is essentially a weighted average calculation in violation of this Court's directive and <u>Bicycles</u>.  <u>See id.</u> at 7-9.

Jilin, however, misinterprets the Court's reliance on <u>Bicycles</u>.  This Court referred to <u>Bicycles</u> because it was one of the few investigations where Commerce actually addressed the issue of weighted average factory overhead, SG&A, and profit.  <u>Bicycles</u> did not specify, and this Court did not previously address, the issue of whether a specific simple average needed to be used; rather the Court referred to <u>Bicycles</u>' directive that Commerce adhere to its normal practice unless it could explain the reasons for its departure.  Commerce's normal practice with regard to profit calculation in NME cases has evolved since <u>Bicycles</u>. Commerce has been excluding zero profits in market economy cases since 1997, see <u>Silicomanganese from Brazil: Final Results of Antidumping Duty Administrative Review</u>, 62 Fed. Reg. 37,869, 37,877 (July 15, 1997), and slowly began to apply this methodology to nonmarket economies.  <u>See, e.g.</u>, <u>Certain Small Diameter Carbon and Alloy Seamless Standard, Line and Pressure Pipe from Romania</u>, 65 Fed. Reg. 5,594, 5,598 (Feb. 4, 2000)(discussing the issue of non-profitable surrogates although excluding on other grounds).  As long as Commerce properly explains its reasons, and its practice is reasonable and permitted by the statute, Commerce's practice can and should continue to change and evolve.  <u>See,e.g.</u>, <u>Zenith Elecs.</u>

Corp. v. United States, 77 F.3d 426, 430 (Fed. Cir. 1996).

Commerce acknowledges that its "practice with respect to including zero profits in calculating average profit rates has varied over time and is not consistent." Remand Determ. at 19.[9] It argues, however, that "while exceptions to the practice exist since the Final Determination, we have followed the policy described in Reinforcing Bars from the PRC and Reinforcing Bars from Moldova, and cited to in Windshields from the PRC and Hot-rolled Steel from the PRC, because the issue was clearly raised and addressed in these cases." Id.

In Notice of Final Determination of Sales at Less than Fair Value: Steel Concrete Reinforcing Bars from the People's Republic of China, 66 Fed. Reg. 33,522 (June 22, 2001), Commerce explained that it did not think there was a reason to distinguish between market and nonmarket economy producers with regard to profit

---

[9]Jilin cites to Tapered Roller Bearings and Parts Thereof, Finished and Unfinished, from the People's Republic of China: Final Results of 1999-2000 Administrative Review, Partial Rescission of Review and Determination not to Revoke Order in Part, 66 Fed. Reg. 57,420 (Nov. 15, 2001), as a recent example of Commerce's varied methodology. Jilin's Remand Comments at 10. However, in Tapered Roller Bearings, the only recent case in which companies with losses were included in the profit calculation, Commerce did not even follow its normal practice of using a simple average, but applied a weighted average to calculate profit. We remanded this case precisely because Commerce did not explain its inconsistent use of a weighted average. In the Remand Determination, Commerce attempts to explain its approach and present a consistent practice. Tapered Roller Bearings therefore does not affect the situation presented here.

calculations. According to Commerce, the same principles apply to both and therefore it has decided to extend its practice of excluding negative losses in the calculation of profit for market economy producers to nonmarket economy producers. As Commerce articulated in Reinforcing Bars from the PRC,

> [a]lthough in some past cases we have averaged in a loss as zero profit, we believe a better approach is found in Certain Fresh Cut Flowers from Ecuador: Preliminary Results and Partial Recision of Antidumping Administrative Review, 64 FR 18878 (April 16, 1999)(Flowers from Ecuador), which disregards financial statements showing a loss for purposes of calculating the profit component of constructed value under Section 773(e)(2) of the Act in market economy cases. The same principles applied in Flowers from Ecuador are reasonably applied in a nonmarket economy case.

See Issues and Decision Memorandum, Comment 8; Reinforcing Bars from the PRC, 66 Fed. Reg. at 33,522. Flowers from Ecuador, referring to Silicomanganese from Brazil, disregarded financial statements of producers that incurred losses because it "enabled [Commerce] to derive an element of profit as contemplated by the [Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.A.N. 1440, at 826 (1994) ("SAA")]." Flowers from Ecuador, 64 Fed. Reg. at 18,883.[10] The SAA, according to these investigations, contemplates the use of positive profits.

---

[10]The SAA is "an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d) (2000).

As Commerce explained in Flowers from Ecuador and Silicomanganese from Brazil, and as it also argues here, constructed value "must include an amount for SG&A expenses and for profit" to be a fair sales price. SAA at 839. In making this profit calculation, the SAA allows Commerce to "ignore sales that it disregards as a basis for normal value, such as those disregarded because they are made at below-cost prices." Id. As the SAA explains, "in most cases Commerce would use profitable sales as the basis for calculating profit for purposes of constructed value." Id. at 840. Furthermore, "[s]ales at a loss are consistently rejected, both as a basis for normal volume (19 U.S.C. § 1677b(b)) and as a basis for constructed value (19 U.S.C. § 1677b(e))." Rhodia's Opp'n to Jilin's Remand Comments at 8. Because negative losses are often rejected and ignored for normal value, based on the clear expression of legislative intent contained within the SAA, Commerce's decision to exclude them from the profit ratio is a reasonable extension of this policy.

Moreover, this practice is consistent with the dictionary definition of the term "profit." See Def.'s Mem. Opp'n to Pl's Second Mot. J. Agency R. and Comments of Def.-Int. at 21 (citing Silicomanganese from Brazil, 62 Fed. Reg. 37,869, 37,877 (July 15, 1997)). Silicomanganese from Brazil quotes Barron's Financial Guides: Dictionary of Finance and Investment Terms 310 (1987), defining "profit" as "the 'positive difference that results from

selling products and services for more than the cost of producing these goods' and also the 'difference between the selling price and the purchase price of commodities or securities when the selling price is higher.'" Silicomanganese from Brazil, 62 Fed. Reg. at 37877.    Commerce reasonably relies on the SAA and dictionary definitions of profit to conclude that only a positive figure should be included.

Jilin, however, claims that there are "fundamental differences in market and non-market economy cases."  Remand Determ. at 17. Jilin argues that the difference lies in the information obtained by Commerce – for market economy producers, Commerce has enough below-cost sales information to achieve alternative profit calculations, but with nonmarket economy producers Commerce only has public financial statements without sales-specific data.   In nonmarket economy cases, Commerce attempts to construct a product's price "as it would have been if the nonmarket economy country were a market economy, using the best information available regarding surrogate values."  Air Prods. and Chems., Inc. v. United States, 22 CIT 433, 435 ,14 F.Supp.2d 737, 741 (1998); see also Remand Determ. at 17.   By only including profitable producers, Jilin argues that Commerce does not properly construct a product's price as it would have been in the nonmarket economy.   Notwithstanding its argument, Jilin offers no substantive or evidentiary basis for its claim.  Even if there are differences in the data available to

Commerce for nonmarket economy and market economy producers, Jilin has offered nothing to demonstrate that Commerce's use of a similar approach for the two will produce erroneous results.

Accordingly, this Court will defer to Commerce's reasonable interpretation of the statute. Here, Commerce reasonably applied the logic and methodology used for market economies to nonmarket economies. Therefore, we uphold Commerce's exclusion of zero profits from the profit calculation.

_____
Donald C. Pogue, Judge

Dated:     September 9, 2002
           New York, New York