SLIP OP. 08-44

## UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                               :

GLEASON INDUSTRIAL PRODUCTS,  :
INC., and PRECISION PRODUCTS, INC.,  :

                               :

            Plaintiffs,       :

          v.                :        Before: Jane A. Restani, Chief Judge

                               :

UNITED STATES,               :        Court No. 07-00177

                               :

            Defendant,      :

                               :

            and              :

                               :

SINCE HARDWARE (GUANGZHOU)  :
CO., LTD.,                      :

                               :

            Defendant-Intervenor. :
_____:

## OPINION

[Plaintiffs' motion for judgment on the agency record denied.]

                                               April 25, 2008

        Crowell & Moring, LLP (Matthew P. Jaffe) for the plaintiffs.

        Jeffrey S. Bucholtz, Acting Assistant Attorney General; Jeanne E. Davidson, Director; Patricia M. McCarthy, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Stephen C. Tosini); Irene H. Chen, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of counsel, for the defendant.

        Trade Pacific, PLLC (Robert G. Gosselink and Jon M. Freed) for the defendant-intervenor.

        Restani, Chief Judge:  This matter is before the court on Plaintiffs Gleason

Industrial Products, Inc. and Precision Products, Inc.'s ("Plaintiffs") motion for judgment upon

the agency record pursuant to USCIT Rule 56.2. Plaintiffs, domestic producers of hand trucks

and parts thereof, challenge the United States Department of Commerce's ("Commerce") final

results determination made in the administrative and new shipper reviews of the antidumping

duty order on hand trucks from the People's Republic of China ("PRC").[1] (See Compl. ¶ 8); see

also Hand Trucks and Certain Parts Thereof From the People's Republic of China: Final Results

of Administrative Review and Final Results of New Shipper Review, 72 Fed. Reg. 27,287 (May

15, 2007) ("Final Results"). For the reasons stated below, the court finds that Commerce's final

determination was supported by substantial evidence and is in accordance with law and denies

Plaintiffs' motion for judgment on the agency record.

## BACKGROUND

Plaintiffs filed a petition with Commerce in November 2003, alleging that various

manufacturers from the PRC were importing hand trucks into the United States at less-than-fair

value. (Compl. ¶ 1.) An antidumping duty order was placed on hand trucks from the PRC in

December 2004. See Notice of Antidumping Duty Order: Hand Trucks and Certain Parts

Thereof From the People's Republic of China, 69 Fed. Reg. 70,122 (Dec. 2, 2004). In February

2006, Commerce initiated an administrative review of the antidumping duty order for the period

of May 24, 2004 (subsequently corrected to December 1, 2004), through November 30, 2005.

See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for

Revocation in Part, 71 Fed. Reg. 5,241 (Feb. 1, 2006). Commerce also initiated a new shipper

---

[1] Plaintiffs participated as interested parties in the antidumping duty administrative and new shipper reviews within the meaning of 19 U.S.C. §§ 1677(9)(C) and 1516a(f)(3) and thus have standing to bring this action. 19 U.S.C. §§ 1516a(f)(3), 1677(9)(C) (2000).

review[2] of Since Hardware (Guangzhou) Co., Ltd. ("Since Hardware"), a Chinese producer and

exporter of hand trucks shipped to the United States. See Hand Trucks and Certain Parts

Thereof From the People's Republic of China; Initiation of New Shipper Review, 71 Fed. Reg.

5,810 (Feb. 3, 2006).

Commerce considered the PRC a nonmarket economy ("NME")[3] for the purpose of these

reviews, and calculated normal value pursuant to 19 U.S.C. § 1677b(c), which requires

Commerce to collect data regarding the NME producer's factors of production[4] ("FOP") and

value them in relation to FOP prices or costs for merchandise produced in one or more surrogate

market-economy countries. See 19 U.S.C. § 1677b(c) (2000); see also Hand Trucks and Certain

Parts Thereof From the People's Republic of China; Preliminary Results and Partial Rescission

of Administrative Review and Preliminary Results of New Shipper Review, 72 Fed. Reg. 937,

939 (Jan. 9, 2007) ("Preliminary Results"). Commerce selected India as the surrogate country

for valuing Chinese hand truck producers' FOP. Preliminary Results, 72 Fed. Reg. at 940.

In order to collect the appropriate data for the administrative and new shipper reviews,

---

[2] A new shipper review has been described as a proceeding where "Commerce is essentially conducting a new antidumping review that is specific to a particular producer [or exporter]." Tianjin Tiancheng Pharm. Co. v. United States, 366 F. Supp. 2d 1246, 1249 (CIT 2005). The new exporter or producer of the merchandise must establish that it did not export the merchandise to the United States during the period of investigation and was not affiliated with an exporter or producer that exported the merchandise that is subject to an antidumping or countervailing duty order. 19 U.S.C. § 1675(a)(2)(B)(i) (2000).

[3] A nonmarket economy is defined as "any foreign country that [Commerce] determines does not operate on market principles of cost or pricing structures, so that sales of merchandise in such country do not reflect the fair value of the merchandise." 19 U.S.C. § 1677(18)(A).

[4] 19 U.S.C. § 1677b provides an illustrative, though not exhaustive, list of factors of production used in the manufacturing of merchandise, including "hours of labor required, quantities of raw materials employed, amounts of energy and other utilities consumed, and representative capital cost, including depreciation." 19 U.S.C. § 1677b(c)(3).

Commerce submitted questionnaires to the Chinese respondents, including Since Hardware and

True Potential Co., Ltd. ("True Potential"), a Chinese trading company that purchases hand

trucks from Chinese hand truck producers and resells them to unaffiliated U.S. purchasers for

export to the United States.  Id. at 937; (see also True Potential Questionnaire Section A

Response, at A-9 (Administrative R. Doc. No. 700).)  Commerce also conducted an on-site

verification of Since Hardware's responses.  Preliminary Results, 72 Fed. Reg. at 939; (see also

Verification of Sales and Factors Responses of Since Hardware (Guangzhou) Co., Ltd., at 1

(App. to Mem. of P. & A. in Supp. of Mot. for J. on the Agency R.  8 ("Pls.' App."))).)  Since

Hardware stated that it sold only one type of hand truck to the United States during the review

period, which incorporated two wheel hubs and two bearings ("axis of rotation") for use with

two wheels.  (See Since Hardware Questionnaire Section A Response, at 15 (Pls.' App. 2); Since

Hardware Questionnaire Section C and D Response, at 10–14 (Pls.' App. 3).)  In response to

Commerce's inquiry, Since Hardware noted that roller bearings were used in the hand truck.

(Since Hardware Questionnaire Section C and D Response, at 13–14 (Pls.' App. 3).)

In its surrogate value submission, Since Hardware proposed that Commerce use Indian

Harmonized Tariff Schedule ("HTS") 8483.20.00 ("Bearing Housing, Incorporating Ball/Roller

Bearing") to calculate the surrogate value for its axis of rotation material input.  (See Since

Hardware Surrogate Value Submission, at 2 (Pls.' App. 7).)  Plaintiffs submitted publicly

available information for valuing the FOP, including audited financial statements of an Indian

producer of hand trucks.  (See Comments of Petitioners Regarding Surrogate Values (App. to

Def.'s Resp. to Pls.' Mot. for J. Upon the Admininstrative R. 1 ("Def.'s App.")).)

On January 9, 2007, Commerce issued the preliminary results of these reviews and

rescinded the administrative review of Since Hardware because its merchandise was being examined in the context of the new shipper review. See Preliminary Results, 72 Fed. Reg. at 939. Commerce selected data relevant to merchandise classified under HTS 8483.20.00 to arrive at a surrogate value for Since Hardware's axis of rotation. (See Factors of Production Valuation Memorandum for the Preliminary Results of the First Administrative Review and Preliminary Results of the First New Shipper Review, at 2–3 ("FOP Memorandum") (Def.'s App. 2).) Commerce also calculated the normal value for True Potential based on the FOP for those Chinese manufacturers from whom True Potential purchased hand trucks during the review period, including selling, general and administrative ("SG&A") expenses and profit ratios, based on the financial statements of surrogate Indian producers of the same or similar merchandise. (Id. at 7–8); Preliminary Results, 72 Fed. Reg. at 946.

In its post-preliminary determination brief, Since Hardware argued that the preliminary calculation using HTS 8483.20.00 data overstated the cost of the axis of rotation and proposed that Commerce now value this input using HTS 8482.10.11 data ("Adapter Ball Bearings (Radial Type)" not exceeding 50 mm). (See Since Hardware Case Brief, at 1–7 (Pls.' App. 13).) Since Hardware maintained that HTS 8482.10.11 was more specific to the housed bearings it used because the bearing size is limited to a 50 millimeter diameter, which is similar to the size of Since Hardware's bearings, while HTS 8483.20.00 contains no size restrictions for bearing housings. (Id. at 6–7.) Plaintiffs objected, arguing that Since Hardware's axis of rotation is a housed bearing that incorporates a roller bearing and thus falls clearly within HTS 8483.20.00. (See Rebuttal Brief on Behalf of Petitioners, at 7–11 (App. to Def.-Intervenor's Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. Upon the Agency R. 1).) Plaintiffs also argued that Commerce

erred in not including the SG&A expenses incurred and additional profits made by True

Potential in reselling the hand trucks to its customers and asked Commerce to incorporate

reseller SG&A expenses and profit ratios based on the submitted surrogate information in its

final determination.  (See Gleason Case Brief, at 38–42 (Pls.' App. 14).)

On May 15, 2007, Commerce published its final results for the administrative and new

shipper reviews.  See Final Results, 72 Fed. Reg. at 27,287; see also Issues and Decision

Memorandum for the Final Results, A-570-891, POR 12/1/04 - 11/30/05, at 43–49 (May 9,

2007), available at http://ia.ita.doc.gov/frn/summary/PRC/E7-9324-1.pdf ("Issues & Decision

Memorandum").  In its final determination, Commerce altered its preliminary findings and

"applied a weighted-average surrogate value derived from imports statistics using both HTS

classifications, i.e., 8483.20.00 and 8482.10.11."  Issues and Decision Memorandum at 49.  On

this point, Commerce found "the size of the bearing to be more instructive," reasoning that

because "HTS 8482.10.11 limits the bearings to a certain size . . . [this] complement[s] the HTS

classification used in the Preliminary Results [i.e., HTS 8483.20.00]."  Id.  Commerce relied on

publicly available information provided by Since Hardware for Nagori, an Indian producer of

hand trucks, in order to value the SG&A expenses and profit surrogate ratios for Indian

producers of similar merchandise.  Id. at 19.  Commerce, however, denied Plaintiffs' request to

incorporate a reseller SG&A ratio and a reseller profit ratio into Commerce's normal value

calculation, stating that Plaintiffs had "provided no new information on the activities of the

surrogate Indian producers or trading companies to justify a departure from the Department's

handling of this same issue in the investigation."  Id. at 53.  Plaintiffs now seek review of these

final determinations, claiming that Commerce's decision was not supported by substantial

evidence or in accordance with law.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to 28 U.S.C. § 1581(c).  The court must uphold a final

determination by Commerce in an antidumping investigation unless it is "unsupported by

substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C.

§ 1516a(b)(1)(B)(i).  Thus, Commerce's findings must be "reached by reasoned decision-

making, including . . . a reasoned explanation supported by a stated connection between the facts

found and the choice made."  Rhodia, Inc. v. United States, 185 F. Supp. 2d 1343, 1349 (CIT

2001) ("Rhodia I") (quotations omitted).

## DISCUSSION

**A.       Commerce's decision to weight-average the surrogate values for two HTS bearing
classifications to calculate a surrogate value for Since Hardware's bearings was
supported by substantial evidence and is in accordance with law**

Commerce is required to "determine the normal value of the subject merchandise on the

basis of the value of the factors of production utilized in producing the merchandise."  19 U.S.C.

§ 1677b(c)(1)(B).  Commerce must do so "based on the best available information regarding the

values of such factors in a market economy country or countries considered to be appropriate by

the administering authority."  Id.  Although the statute does not define what constitutes "best

available information," it has been interpreted as "grant[ing] to Commerce broad discretion to

determine the 'best available information' in a reasonable manner on a case-by-case basis."

Timken Co. v. United States, 166 F. Supp. 2d 608, 616 (CIT 2001); see also Nation Ford Chem.

Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (noting that "§ 1677b(c) provides

guidelines to assist Commerce . . . [and] also accords Commerce wide discretion in the valuation

of factors of production in the application of those guidelines"); Coal. for the Pres. of Am. Brake

Drum and Rotor Aftermarket Mfrs. v. United States, 44 F. Supp. 2d 229, 258 (CIT 1999)

("Commerce need not prove that its methodology was the only way or even the best way to

calculate surrogate values for factors of production as long as it was a reasonable way.").

After Commerce selected India as the surrogate country for valuing Chinese hand truck

producers' FOP, Commerce then selected an Indian HTS classification in order to obtain data

relevant to the particular factor input at issue.  Plaintiffs argue that Commerce failed to make a

reasonable connection between the facts on the record and its determination, and therefore,

Commerce's selection of the surrogate value for Since Hardware's axis of rotation was contrary

to law and unsupported by substantial evidence.  (Mem. of P. & A. in Supp. of Mot. for J. Upon

the Agency R. 20 ("Pls.' Br.").)  Specifically, Plaintiffs contend that Commerce should have

used only the surrogate value data for HTS subheading 8483.20.00, rather than weight-averaging

it with HTS subheading 8482.10.11 data, claiming that the record conclusively demonstrates that

the axis of rotation incorporates a roller bearing, not a ball bearing, and that Commerce's

reliance on the size of the bearing, rather than the roller element, was incorrect.  (Pls.' Br.

10–20.)

In support of this argument, Plaintiffs cite Since Hardware's response to Commerce's

questionnaires stating that the bearing incorporated in the axis of rotation is a roller bearing, as

well as to numerous supplemental responses (notwithstanding Since Hardware's post-

preliminary brief) that never changed the designation.  (See Since Hardware Questionnaire

Section C and D Response, at 13–14 (Pls.' App. 3); see also Since Hardware Supplemental

Questionnaire Response, at 7 (Pls.' App. 6).)  Plaintiffs state that the record contains no

information as to the size, or size range, of the bearing incorporated in the axis of rotation.  (Pls.'

Br. 19–20.)  Plaintiffs further argue that in Commerce's questionnaires, as well as in periodic

administrative and five-year (sunset) reviews, the distinction relied on for bearings is the rolling

element (i.e., ball bearing, roller bearing, etc.), not the size or size range of the bearing.  (Id.)

In rebuttal, Defendant argues that weight-averaging the surrogate values derived from

data for both HTS classifications constituted the best available information to value Since

Hardware's housed bearings.  (Def.'s Resp. to Pls.' Mot. for J. Upon the Admininstrative R. 9

("Def.'s Br.").)   Defendant maintains that the exclusive use of HTS 8483.20.00 in the

preliminary findings resulted in a disproportionately inflated normal value, as it yielded a cost

for the housed bearings that exceeded the total cost of all other direct materials incorporated into

the hand truck.  (Id. at 10.)[5]  Defendant also claims that Commerce's use of HTS 8482.10.11 was

reasonable given the specificity contained therein, highlighting Commerce's finding that the size

range covered by HTS 8482.10.11 "appears to be similar to the size of Since Hardware's

bearings examined at verification."  (Id. at 11.)  Defendant argues that because HTS 8482.10.11

complements HTS 8483.20.00, Commerce's use of a weight-average was reasonable in order to

determine the most appropriate surrogate value.  (Id. at 10–12.)

Commerce is required to "articulate in what way the surrogate value chosen relates to the

factor input."  Dorbest Ltd. v. United States, 462 F. Supp. 2d 1262, 1308 (CIT 2006); see also

Siderca, S.A.I.C. v. United States, 350 F. Supp. 2d 1223, 1236 n.15 (CIT 2004) ("It will not do

for a court to be compelled to guess at the theory underlying the agency's action; nor can a court

---

[5] While in some cases the value of one input may outweigh that of all others, there is no
evidence that this input is in that category.

be expected to chisel that which must be precise from what the agency has left vague and indecisive."). Here, Commerce provided a detailed reasoning for its decision to weight-average the surrogate values for the two HTS commodity classifications. See Issues and Decision Memorandum at 47–49. Commerce noted that because Since Hardware reported using a housed bearing in the production of its hand truck and initially suggested using HTS 8483.20.00 to value its bearings, it was still appropriate to use data for this HTS classification as part of the averaged value, as Since Hardware was "in the best position to determine the HTS classification that best describes its input." Id. at 48. Commerce noted, however, that solely using HTS 8483.20.00 to value the axis of rotation would result in a surrogate value that "would have exceeded the total cost of all other direct materials incorporated in Since Hardware's hand truck," thereby rendering it "disproportionate to the total cost of materials of the subject merchandise." Id. Commerce then sought to balance its reliance upon HTS 8483.20.00 by also using HTS 8482.10.11, which it determined "appears to contain the main characteristics applicable to the [sic] Since Hardware's bearings." Id. at 49. Specifically, Commerce found that because there was no evidence on the record regarding the cost of roller bearings versus ball bearings, it would not consider the type of bearing to be "especially relevant." Id. Instead, Commerce found the size of the bearing to be most informative, noting that "[t]he fact that HTS 8482.10.11 limits the bearings to a certain size yet, at the same time, includes bearings that may rotate horizontally or vertically, and are in a metal housing, appears to complement the HTS classification used in the Preliminary Results." Id.

Nonetheless, Plaintiffs argue that Commerce erred when it classified Since Hardware's axis of rotation according to HTS 8482.10.11, because Commerce did not follow the appropriate

steps according to the General Rules of Interpretation ("GRI") accompanying the HTS.  (Pls.'

Br. 17–18.)  GRI 1 states that "classification shall be determined according to the terms of the

headings and any relative section or chapter notes."  Harmonized Tariff Schedule of the United

States, GRI 1.  Additionally, "[i]f classification is not resolved by application of GRI 1, the court

will refer to the succeeding GRIs in numerical order."  Whirlpool Corp. v. United States, 505 F.

Supp. 2d 1358, 1362 (CIT 2007).  Plaintiffs argue that Commerce was required under GRI 1 to

first look to the four-digit headings, i.e., 8482 and 8483, followed by the six-digit codes and then

the eight-digit codes.  (Pls.' Br. 17–18.)  Plaintiffs contend that HTS 8483 is more specific

because it covers "bearing housings," while HTS 8482 only covers "ball or roller bearings," and

therefore, the input in question should be classified under HTS 8483.  (Id.)  Plaintiffs further

argue that because the six-digit codes in HTS 8482 classify bearings by rolling element before

classifying them by size under the eight-digit code, this demonstrates that bearing type trumps

bearing size.  (Id. at 20.)[6]

_____

[6] Defendant claims Plaintiffs failed to exhaust their administrative remedies and that the court should disregard two arguments made for the first time in Plaintiffs' brief before the court, that is, Plaintiffs' contention that the GRI preclude Commerce from classifying housed bearings under HTS 8482.10.11, and Plaintiffs' argument that the bearing's rolling element must be viewed as crucial in Commerce's selection of a surrogate value for the housed bearings.  (Def.'s Br. 12.)  Defendant claims these arguments should not be considered by a reviewing court because they were not raised by Plaintiffs in the administrative proceeding, thus "depriv[ing] Commerce of the opportunity to analyze these arguments in the first instance."  (Id. at 14.)  Defendant's argument is misplaced, however, because Commerce's partial use of HTS 8482.10.11 to value Since Hardware's input and its corresponding emphasis on the size of the bearing occurred for the first time in the Final Determination.  Plaintiffs have had no reason to focus on these subarguments of their main argument, which was preserved, that HTS 8483.20.00 data should be used, and therefore, they are not found to have waived their right to have the court review their arguments.  See Rhodia I, 185 F. Supp. 2d at 1349–50 n.6 (finding that two Chinese companies "were under no notice that Commerce would apply a weighted average. . . . Accordingly, neither [of the Chinese companies] will be required by the court to further exhaust

(continued...)

Plaintiffs' arguments regarding the binding nature of the GRI on Commerce in the antidumping context are misplaced. For example, "[t]he court distinguishes between the authority of the Customs Service to classify according to tariff classifications (19 U.S.C. § 1500) and the power of the agencies administering the antidumping law to determine a class or kind of merchandise." Royal Bus. Machs., Inc. v. United States, 507 F. Supp. 1007, 1014 n.18 (CIT 1980). As opposed to Customs classification cases where "determining the proper specific classification is paramount," in order to assign ordinary duties properly, Commerce cases often involve "using the HTS[I] merely to approximate the cost of a factor of production." Dorbest, 462 F. Supp. 2d at 1308 (citations omitted). If the data for an HTS provision substantially overstates the cost, it may be presumed that it is not accurate data, whether or not the correlating part in India could be classified under that provision. The problem may be the lack of a perfect surrogate, for which Commerce must then adjust. As a result, Commerce determined that weight-averaging both bearing categories into a single surrogate value constituted the best available information to value the type of bearings incorporated into Since Hardware's hand trucks. Issues and Decision Memorandum at 49. Here, Plaintiffs' preferred valuation method has not been demonstrated to be superior to Commerce's.

Based on the foregoing reasons, the court finds that Commerce acted well within its discretion in determining that a weight-averaged surrogate value constituted the best available information to value Since Hardware's axis of rotation input.

---

[6](...continued)
its administrative remedies with regard to this issue").

**B.      Commerce's decision to not include the SG&A expenses and profit of Indian trading companies in the calculation of True Potential's normal value was supported by substantial evidence and is in accordance with law**

When constructing the normal value for a respondent in a NME country, Commerce must also take into account those costs that are not covered by the factors of production, such as the "amount for general expenses and profit plus . . . other expenses."  19 U.S.C. § 1677b(c)(1)(B); see also Guangdong Chems. Imp. & Exp. Corp. v. United States, 460 F. Supp. 2d 1365, 1373 (CIT 2006).  It is Commerce's usual practice to calculate "separate values for [SG&A] expenses, manufacturing overhead and profit, using ratios derived from financial statements of one or more companies that produce identical or comparable merchandise in the surrogate country." Shanghai Foreign Trade Enters. Co. v. United States, 318 F. Supp. 2d 1339, 1341 (CIT 2004).

Plaintiffs argue that Commerce's calculation underestimated the normal value of the subject merchandise of True Potential because Commerce failed to include in its calculation the SG&A expenses and profits of both the producer and the exporter.  (Pls.' Br. 23–24.)  Plaintiffs rely primarily on the legislative history of 19 U.S.C. § 1677b and Commerce's normal value calculations for market economy country cases in arguing that "Commerce now should definitely include the SG&A expenses and profits of both the producer and the exporter whenever it calculates a reseller's normal value."  (Id. at 23.)  Plaintiffs note that section 1677b previously limited the general expenses and profit calculation in NME cases only to sales made by the NME producers, see 19 U.S.C. § 1677b(c)(1) (1988), but point out that Congress removed this subsection when it passed the Uruguay Round Agreements Act.  (Pls.' Br. 22.)  Plaintiffs highlight the accompanying Statement of Administrative Action, which explains that,

>      [I]n situations where the producer and the exporter are separate companies, the
>      Administration intends that Commerce may continue to calculate constructed

value based on the total profit and total SG&A expenses realized and incurred by both companies. In such situations, failing to include the expenses and profits of both companies would understate the true cost of production and constructed value of the merchandise.

(Id. at 22 (quoting Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Rep. No. 103-316, at 841 (1994), as reprinted in 1994 U.S.C.C.A.N. 4040, 4177).) Plaintiffs further rely upon 19 U.S.C. § 1677(28), which states that for purposes of section 1677b, Commerce should take into account "both the exporter of the subject merchandise and the producer of the same subject merchandise to the extent necessary to accurately calculate the total amount incurred and realized for costs, expenses, and profits in connection with production and sale of that merchandise." 19 U.S.C. § 1677(28); (Pls.' Br. 21.) Finally, Plaintiffs contend that because it is the practice of Commerce to include the reseller's SG&A expenses and profit in its calculation of normal value in market economy country cases, it would be "unreasonable for Commerce to act inconsistently in NME country cases and ignore a reseller's SG&A expenses (and profit) when it calculates the normal value of the subject merchandise as sold by companies like True Potential." (Pls.' Br. 23.)

Defendant contends that Commerce was correct in calculating True Potential's normal value using SG&A expenses and profit surrogate ratios for Indian producers of similar merchandise, because such calculations were based on public, audited, and contemporaneous financial information for Indian producers.[7] (Def.'s Br. 15.) Defendant, however, points to the

---

[7] Defendant mistakenly states that Commerce calculated percentage ratios based upon audited financial information from Indian producer, Rexello. (See Def.'s Br. 15 (citing FOP Memorandum at 7–8).) Commerce only used Rexello in its Preliminary Results and instead used Nagori in its Final Determination, finding it "the only company [identified by Since Hardware] for whom record evidence exists to definitively demonstrate that it produces identical

(continued...)

lack of evidence in the record that would have allowed Commerce to add SG&A expenses and profit ratios of Indian trading companies to True Potential's normal value.  (Id.)

In support of this argument, Defendant argues that Rhodia I and Rhodia, Inc. v. United States, 240 F. Supp. 2d 1247 (CIT 2002) ("Rhodia II") support its position.  In Rhodia I, the court found that Commerce erred in applying an Indian surrogate company's overhead-to-raw-material ratio twice, because Commerce had not identified evidence demonstrating that the surrogate companies were less integrated than the Chinese producers, such evidence which would support the underlying basis for such a calculation.  Rhodia I, 185 F. Supp. 2d at 1346–49. The court remanded, due to the absence of facts in the record to support such a determination, id. at 1349, and on remand Commerce applied the overhead ratio once, finding that "the surrogates were representative of the PRC producers' experience,"  Rhodia II, 240 F. Supp. 2d at 1249–50. The court sustained the remand determination, finding that Commerce could not depart from its standard practice of "not generally adjust[ing] the surrogate values used in the calculation of factory overhead" without "substantial evidence in the record which supports a finding that the surrogate producers are less integrated that [sic] the PRC producers, and as a result have a lower overhead ratio."  Id. at 1250–51.  Defendant argues that the Rhodia cases are analogous to the instant case, because there is similarly no evidence in the record "concerning which selling activities were performed by the various Indian producers and resellers."  (Def.'s Br. 17.)

In the Final Determination, Commerce found that "without knowing the selling activities undertaken by the Indian producers whose information is being used to calculate an SG&A ratio,

---

[7](...continued)
merchandise, i.e., hand trucks."  Issues and Decision Memorandum at 19.

we cannot say whether or to what extent they differ from the selling activities of True Potential and its suppliers," and thus it did not apply the SG&A expenses and profit of Indian trading companies to the calculation of True Potential's normal value. See Issues and Decision Memorandum at 52–53 (quoting Issues and Decision Memorandum for the Final Results of the Investigation of Hand Trucks and Certain Parts Thereof from the People's Republic of China, 69 Fed. Reg. 60980, A-570-891 (Oct. 14, 2004), available at http://ia.ita.doc.gov/frn/summary/prc/E4-2608-1.pdf).

With such evidence lacking, the court concludes that Commerce did not err in not including additional reseller SG&A expenses and profit ratios in its calculation of True Potential's normal value. Plaintiffs have not supplied Commerce with the necessary information to support adding reseller exporter's SG&A expenses and profit to the producer-based normal value determination. Plaintiffs have neither explained how it is that Commerce should have obtained this information nor have they claimed that Commerce did an inadequate investigation by not seeking this information in a particular way. Instead, Plaintiffs, in their second surrogate value submission, stated that they provided both "publicly available financial data pertaining to trading companies in India" and "the calculation of financial ratios for trading companies in India." (See Letter from Crowell & Moring LLP to Sec'y of Commerce (Feb. 5, 2007) (Pls.' App. 12).) Plaintiffs, however, did not provide any data as to the selling activities of Indian hand truck producers and specifically, of Nagori, whose financial statements Commerce used as the source for calculating the surrogate financial ratios. Without such information, there is no way to compare the selling activities of the Indian hand truck producers with the selling activities of

True Potential and its unaffiliated[8] PRC producers.  This is particularly important, because, as

noted by True Potential, "it is possible that a producer in India performs all of the selling

activities itself that are spread between True Potential and its supplier in the PRC," which would

then result in double-counting SG&A expenses and profit.  See Issues and Decision

Memorandum at 52.  Stated differently, without knowing whether Nagori serves as only a

producer, and not an exporter, of hand trucks in India, it is impossible to determine whether

applying further SG&A expenses and profit for the reseller would be duplicative, or not.

Similarly, Plaintiffs' reliance upon § 1677(28) is misguided.  Section 1677(28) states that

in calculating normal values, Commerce should take into account "both the exporter of the

subject merchandise and the producer of the same subject merchandise to the extent necessary to

accurately calculate the total amount incurred and realized for costs, expenses, and profits in

connection with production and sale of that merchandise."  19 U.S.C. § 1677(28).  By its very

language, this section is predicated upon the submission or availability of evidence that will help

Commerce to "accurately calculate" the normal values.  Thus, while using additional trading

company data is now allowed, it is not mandated if a factual basis for its use is absent.

Finally, while Rhodia I and II are distinguishable from the case at hand, they do support

the concept that without adequate information, Commerce cannot ascertain whether, by using

additional trading company data, it would be over-calculating the SG&A expenses and profit in

determining True Potential's normal value.

---

[8] Factual statements in briefs must cite to the administrative record.  USCIT R.
56.2(c)(2).  Although Plaintiffs have not provided any authority for their assertion that True
Potential is unaffiliated with its Chinese producers, True Potential has stated as much to
Commerce.  (See True Potential Questionnaire Section A Response, at A-9 (Administrative R.
Doc. No. 700).)

Commerce articulated facts in the record which adequately support its decision to not include SG&A expenses and profit of Indian trading companies in calculating True Potential's normal value, and thus, its determination will be sustained.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for judgment on the agency record is denied.

 

 

 

 

                                            /s/ Jane A. Restani
                                                  Jane A. Restani
                                                  Chief Judge

 

 

Dated: This 25th day of April, 2008.
          New York, New York.